UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | Civil Action No.: 09-CV-1749 (GBD) |
| Plaintiff, | |
| -against- | |
| STEPHEN WALSH, PAUL GREENWOOD, WESTRIDGE CAPITAL MANAGEMENT, INC., WG TRADING INVESTORS, LP, WGIA, LLC, | |
| Defendants, | |
| WESTRIDGE CAPITAL MANAGEMENT ENHANCEMENT FUNDS INC., WG TRADING COMPANY LP, WGI LLC, K&L INVESTMENTS, AND JANET WALSH, | |
| Relief Defendants. | |
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| -against- | Civil Action No.: 09-CV-1750 (GBD) |
| WG TRADING INVESTORS, L.P., WG TRADING COMPANY LIMITED PARTNERSHIP, WESTRIDGE CAPITAL MANAGEMENT, INC., PAUL GREENWOOD, and STEPHEN WALSH, | |
| Defendants, | |
| ROBIN GREENWOOD and JANET WALSH, | **REPORT OF TEMPORARY RECEIVER'S ACTIVITIES FOR THE PERIOD FROM FEBRUARY 25, 2009 THROUGH MAY 22, 2009** |
| Relief Defendants. | |

**TO:   THE HONORABLE GEORGE B. DANIELS, UNITED STATES DISTRICT**

**COURT JUDGE, AND ALL PARTIES IN INTEREST:**

Robb Evans & Associates LLC, Temporary Receiver in the above-entitled matters,

herewith submits its Report of Temporary Receiver's Activities for the period from February 25, 2009 through May 22, 2009.

Dated: May 27, 2009

**FRANDZEL ROBINS BLOOM & CSATO, L.C.**

By:  /s/ Craig A. Welin
      Craig A. Welin, Esq.
      Thomas S. Arthur, Esq.
      6500 Wilshire Boulevard, 17th Floor
      Los Angeles , CA 90048
      Tel.: (323) 852-1000
      Fax: (323) 651-2577

           -and-

      Christopher F. Graham, Esq.
      Alan F. Kaufman, Esq.
      **MCKENNA LONG & ALDRIDGE LLP**
      230 Park Avenue, Suite 1700
      New York, New York 10169
      Tel.: (212) 922-1800
      Fax: (212) 922-1819

      Co-*Counsel for Temporary Receiver*
      *Robb Evans & Associates LLC*

# ROBB EVANS & ASSOCIATES LLC
### Temporary Receiver of
### WG Trading Company LP, et al.

### REPORT OF TEMPORARY RECEIVER'S ACTIVITIES
### FEBRUARY 25, 2009 THROUGH MAY 22, 2009

## Overview

On February 25, 2009 on the nomination of the Commodity Futures Trading Commission and on the nomination of the Securities and Exchange Commission, this Court appointed Robb Evans & Associates LLC as Temporary Receiver (Receiver[1]) of Westridge Capital Management, Inc. (Westridge), WG Trading Company LP (WGTC), WG Trading Investors, LP (WGTI), and business entities owned by or affiliated with them including Westridge Capital Management Enhancement Funds, Inc., K&L Investments, LLC, WGI LLC and WGTC Limited.   Below is a description and explanation of the business activities of these different entities along with available financial activity and information.  Robb Evans & Associates LLC was also appointed Temporary Receiver of the assets of individual defendants Stephen Walsh, Paul Greenwood, and Relief Defendant Janet Walsh.  This is the first Report to the Court on the progress of the receivership.  It does not constitute an audit of financial condition and is intended only to provide information for use by the Court in assessing progress of the receivership.

Since its appointment, the Receiver has been focusing its efforts on the following broad categories:

- Managing an orderly liquidation of the hedged portfolio.
- Identifying, evaluating, and securing assets of the Receivership Defendant entities, the individual defendants, and the relief defendants.
- Determining the positions carried on the books and records of the Receivership Defendant entities for the investors.
- Performing forensic accounting on the Receivership Defendant entities.
- Communicating with investors.
- Studying business records and financial documents, and interviewing staff members of the Receivership Defendant entities to develop an understanding of the business operations.

---

[1] Reference to the Receiver in this report means the Receiver, the Receiver's deputies, its staff, and its counsel.

The initial results of these activities are presented in detail in this report.  In summary, the Receiver's forensic accounting revealed a long history of WGTC's and WGTI's practice of comingling funds, operating with utter disregard for corporate governance, and employing fraudulent accounting practices in an apparent attempt to conceal the true financial condition of the entities from investors, potential investors and, in the case of WGTC, its regulators.

> For example, between January 1, 1999 and February 25, 2009, WGTI had income of $70.3 million but paid interest, distributions, operating expenses, and other payments totaling to $381.5 million during that same time period.  The details below show the cash shortfall during this period was financed by either WGTC's or WGTI's current investors.

> In addition, WGTC invested in and financed for Signal Apparel Company, Inc. approximately $100 million, in violation of its stated investment policy and program.  As discussed in more detail later in this report, the investment in Signal Apparel Company, Inc. was lost.  However, this loss was never reflected on WGTC's books because the loss was charged to WGTI.

> WGTC allocated actual yearly earnings to its limited partners based on an arbitrary earnings rate and then allocated the remaining income or loss to WGTI. However, WGTI prepared statements for its investors showing fictitious income equal to the rate allocated to the WGTC limited partners.  For the ten-year period from January 1999, WGTC allocated income of $4.2 million to WGTI. The allocated income of $4.2 million plus the operating income of $70.3 million totals $74.5 million.  However, WGTI paid or accrued at least $359.4 million to its investors.

The Receiver has prepared a preliminary estimate of net realizable values of Receivership Estate Assets (Tab 1).  The schedule shows that the Receiver has not been able to estimate the net realizable values on some assets.  In addition, the Schedule under Tab 1 does not include about $48.3 million frozen and segregated funds held at Morgan Stanley for the benefit of investors in Fund A and Fund R of Westridge Capital Management Enhancement Fund, Inc.  The preliminary estimate of net realizable values totals approximately $893 million.  Additional information about realizable asset values will be provided in subsequent Court reports.

As discussed in detail in this report, claims from investors preliminarily total about $1.5 billion[2].  Based on all of the information available to the Receiver, it appears there will be a shortfall of approximately $600 million.

---

[2] Total preliminary investors' open equities and positions as carried on the Receivership Defendant entities' books and records are overstated because the open equities and positions include accrued

## Premises & Control

The Receiver took control of the Receivership Defendants' business premises located at:

One Lafayette Place, Second Floor, Greenwich, CT
111 Town Square Place, Suite 1405, Jersey City, NJ
3333 New Hyde Park Rd., Suite 411, North Hills, NY
222 East Carrillo St., Suite 300, Santa Barbara, CA

The Receiver changed locks at all facilities.  For a short period, the Receiver operated the wind-down of business operations from two of the four facilities.  During this period, a security service was engaged to control access to the premises.

## Management of the Hedged Portfolio

An immediate priority of the Receiver was to develop an understanding of the hedged portfolio held by WGTC and establishing a policy for dealing with it.

To that end, a series of meetings were initiated with the three investment bankers who were serving as custodians and prime brokers for leveraged financial instruments in excess of one billion dollars. J.P. Morgan Clearing Corp., Merrill Lynch, Pierce, Fenner & Smith Incorporated, and Goldman, Sachs Execution & Clearing, L.P., all made themselves available to the Receiver and were helpful and candid.  In addition, multiple meetings were held with the senior trader employed by WGTC who had been managing the portfolio for many years.

The senior trader and the investment bankers were unanimous in their opinion that, under the current circumstances of the receivership defendants, the only sound course of action was to liquidate the hedged portfolio in the short term.  The issue to be resolved was the strategy for that liquidation. There was no immediate consensus regarding a liquidation strategy.

At an early stage of this process the Receiver determined that it may be a fiduciary subject to the Employee Retirement Income Security Act of 1974 (ERISA) and several state laws that placed similar obligations on the fiduciary because a significant percentage of the assets under the control of the Receiver are beneficially owned by various pension funds subject to ERISA. That determination, among other obligations, placed a requirement on the Receiver, as a possible ERISA fiduciary, to satisfy certain ERISA prudence requirements by obtaining expert strategic advice and a qualified co-fiduciary relative to the overall strategy.

monthly investors' earnings for both WGTC and WGTI when, in fact, WGTI never had sufficient matching revenue to pay accrued monthly investors' earnings.

The Receiver retained two well-qualified financial institutions to provide expert guidance on both the overall liquidation strategy and the detailed implementation of that strategy. Those advisors, and the other parties consulted, were informed that the objective of the Receiver was to liquidate the portfolio during the month of March 2009 at the least risk and lowest cost possible, while preserving value for investors. Included in the advice received by the Receiver was a recommendation to retain an expert Transition Manager to effect the liquidation of the portfolio.  The largest provider of transition management services was retained for that purpose.

While the portfolio was well hedged and not significantly exposed to pricing changes during one of the most turbulent markets in history, there was some risk in any liquidation strategy the Receiver might adopt.  After multiple discussions with the Receiver's advisors, the senior trader and others, a trading strategy was successfully implemented and substantially completed by March 20, 2009.  Collection of dividends and completion of other tasks relative to the liquidation process were completed as of May 14, 2009.

Proceeds from the sale and liquidation of the hedged portfolio, net of margin, totaling $811,862,414.30 have been transferred to the control of the Receiver.  Those proceeds have been invested in short-term Treasury obligations or FDIC insured deposits with well-rated institutions. Going forward, every effort will be made, with the assistance of investment experts serving as ERISA fiduciaries, to maximize the yield on these funds, consistent with minimum risk.

In addition, there are two holdings not considered part of the base trading position yet to be sold. They consist of 8,138 common shares of NYSE Euronext (symbol "NYX") with closing price of $24.19 per share on May 18, 2009 for a total of $196,858 and 206 common shares of First Horizon National Corp. (symbol "FHN"), received as stock dividend, with closing price of $11.86 per share on May 18, 2009 for a total of $2,443, which aggregate to approximately $199,300.

## Westridge Capital Management, Inc.

The entity was formed as a Delaware corporation in October 1983 by Mr. Greenwood, Mr. Walsh, and James Carder, who were the sole directors and shareholders.  Stock ownership was distributed 51% to Mr. Greenwood and Mr. Walsh and 49% to Mr. Carder.  In January 2000, Mr. Greenwood and Mr. Walsh resigned as directors of the company, although the ownership percentages did not change.  Mr. Carder reported to the Receiver that the company moved its premises to Santa Barbara in 1996 and began operating as a Registered Investment Advisor and offered an Enhanced Equity Index Management program in April 1996.

According to Mr. Carder, the program offered by Westridge was recommended by several pension management consulting firms and other advisers.  Westridge presented

its program using a PowerPoint presentation that was delivered either by Westridge personnel or an outside adviser, or by both. The customer base of Westridge included employee benefit plans that were either subject to or not subject to ERISA.

Westridge's presentation materials stated that its Enhanced Equity Index program provided excess returns, compared to the S&P 500, every month since April 1996. The account fees were performance-based and limited to one-half of the performance above the market. The company promoted the structure of the Westridge Group with Westridge as a registered investment advisor, regulated by the SEC and with WG Trading as a broker/dealer regulated by the SEC, FINRA, CFTC, NFA, DOL, which was subject to independent annual audits. Under Tab 2 is Page one from the Westridge Power Point presentation.

Westridge held approximately 15% (the "Beta" portion) of an investor's cash investment to support a leveraged futures position in the same amount as the investor's cash investment. About 10% of the cash provided the required margin for the investment in the futures position and the remaining 5% of the cash provided an additional margin reserve. The remaining 85% of the investor's cash investment was scheduled to be sent directly by the investor to WGTC for direct investment in the Enhanced Equity Index program. However, Westridge also offered several options for the placement of the 85% of the investment cash, i.e., investment in WGTI.

The direct investment in WGTC was accomplished by completing limited partnership documents and becoming a limited partner of WGTC. The investor then directed its custodial bank to send the remaining 85% of its investment cash directly to WGTC. However, as explained in more detail below, contributions by WGTC's limited partners were not in every instance received directly by WGTC, but sometimes were received first by the unregulated entity WGTI, and then transferred to WGTC or used for other purposes.

In addition to offering ownership of a limited partnership interest in WGTC, Westridge offered its investors the vehicle of either directly holding senior promissory notes issued by WGTI or purchasing non-voting shares of an entity that invested the proceeds in senior promissory notes issued by WGTI. The investors purchased shares in Westridge Capital Management Enhancement Funds, Inc., a British Virgin Islands (BVI) company. A significant difference from the limited partnership investment was that the proceeds of the purchased shares, or the notes purchased directly, were used to fund senior promissory notes issued by WGTI, a non-regulated and unaudited non-public entity.

Additionally, some investors directly purchased shares in WGTC Limited, also a BVI company, not investing with or through Westridge. The proceeds of these purchased shares also funded senior promissory notes issued by WGTI.

The audited 2007 financial statements of Westridge Capital Management Enhancement Funds, Inc. showed a $315,307,886 balance of note receivable due from WGTI at December 31, 2007, which matched the total of the balances of notes payable due to the Funds offered by Westridge Capital Management Enhancement Funds, Inc. shown on WGTI's books at December 31, 2007.

The audited 2007 financial statements of WGTC Limited showed a $40,237,869 balance of note receivable due from WGTI at December 31, 2007, which matched the total balances of notes payable due to the investors of WGTC Limited shown on WGTI's books at December 31, 2007.

The subscription documents indicate with text and illustrate with diagrams that the proceeds of the senior promissory notes issued by WGTI would be sent to WGTC. The investment documents state that the interest payable on a promissory note would be determined by a hypothetical investment, equal in amount to the principal of the promissory note, invested in a limited partner interest of WGTC. As explained in more detail below, the funds sent to WGTI in exchange for senior promissory notes were used for many purposes and not consistently invested in WGTC. Under Tab 3 are two diagrams that were part of subscription documents and occasionally given to prospects. The second page of the diagrams states that the only business of WGTI is to invest in WGTC.

The investment agreements with Westridge provided that it would manage the Beta portion of the investments. Westridge's duties included establishing the initial futures position, managing the futures exposure and the daily price changes, rolling the futures as appropriate and maintaining client service and communication. In 2008, Westridge also had to manage the funds advanced by WGTC for certain of WGTC's investors or on behalf of WGTI for certain of WGTI's investors to meet the variation margin deposit requirements arising from the daily mark to market. Westridge managed and reconciled the investors' custodial bank accounts, posted all daily transactions and prepared a complete monthly transaction summary for the cash account.

Westridge also prepared a monthly Summary of Investment Portfolio and mailed the summary to each investor. This summary included the total cash and equivalents and a line for Miscellaneous Securities. The value for the Miscellaneous Securities was taken from a single page statement forwarded each month from the WGTC/WGTI office in Jersey City, N J. The statement was titled "Statement of Capital Account" and included the following statement:

> Scheduled below is an analysis of the changes in your capital account in **WG Trading Company LP** (emphasis original).

This wording appeared on each single page statement, whether or not the investment was a limited partnership interest with WGTC, a direct note placement with WGTI, or an indirect note placement through stock ownership in one of the two BVI companies.

## WG Trading Company LP

WGTC is a limited partnership organized on August 24, 1990 under the laws of the State of Delaware. Mr. Greenwood and Mr. Walsh were the managing general partners of WGTC. WGTC was registered as a broker-dealer under the Securities Exchange Act of 1934 and was a commodity pool as defined in Commodity Futures Trading Commission Regulations.

WGTC was engaged primarily in computer-directed index arbitrage trading strategies seeking profit opportunities by exploring relationships among stock index futures contracts, stock market indexes upon which the futures contracts were based, the stocks included in the indexes, and the cost (e.g. interest expense) and benefits (e.g. dividend income) of carrying the instruments.

### Operating History

Under Tab 4 are WGTC's Statements of Operations for the Ten-Year Period of 1999 to 2008. Total net income for the ten-year period was approximately $559 million.

The Receiver's sale and liquidation of the hedged portfolio resulted in a trading gain of approximately $5 million for the period from January 1, 2009 to March 23, 2009.

### WGTC's Statement of Financial Condition at December 31, 2008

Under Tab 5 is WGTC's Statement of Financial Condition at December 31, 2008 compiled by the Receiver based on the company's trial balance.

Other than the hedged portfolio, furniture and equipment, the only identified asset with a realizable value is WGTC's membership interest in Chicago Mercantile Exchange, which was carried on the books at the cost of $169,500.

### Investors of WGTC and Allocation of Income to WGTC's Investors

#### *Investors of WGTC*

As described above, investors invested in WGTC by entering into a limited partnership agreement with WGTC. All investors of WGTC were limited partners of WGTC.

### *Allocation of Income to WGTC's Investors Other than WG Trading Investors, LP*

On a monthly basis, each investor's participation interest in WGTC was updated factoring in the timing of contributions and withdrawals, earnings of the month, and fees if not already charged by Westridge.

The monthly earnings were measured by multiplying the investor's participation interest by the rate of return.  For a given month, the same rate, as determined by Mr. Greenwood[3], applied to all investors.  For example, for the months of December 2008 and January 2009, the rates were 0.76% and 0.40%, respectively.

The computation and allocation of income to the investors were included in the monthly schedules of investor accounts (the Schedules of Investor Accounts[4]).  The Schedules of Investor Accounts include each investor's beginning open equity, contributions and withdrawals, computation of earnings and fees charged, and the ending open equity.  After thorough testing of the information included in the Schedules of Investor Accounts, the Receiver is confident of the information contained in the Schedules.

Upon completion of the Schedule of Investor Accounts for monthly activities, the Statements of Capital Account for those investors who were clients of Westridge were issued by WGTC to Westridge and Westridge then sent the investors' entire investment portfolio statement to the investors.

The above described operating procedures can be illustrated by using a specific investor as an example. The table below shows January 2009 activity of this specific WGTC investor[5].

| | |
|---|---|
| Beginning open equity | $51,901,024 |
| Less capital withdrawal | $  1,250,000 |
| Monthly rate of return | 0.40% |
| Monthly earnings adjusted with timing of withdrawal | $      205,830 |
| Ending open equity | $50,856,854 |

---

[3] The Receiver was informed by the employee responsible for investor accounting that Mr. Greenwood would provide an earnings rate each month.

[4] These schedules were prepared and maintained by the employee responsible for investor accounting.  These schedules cover a period of 13 years from January 1, 1996 through January 31, 2009.

[5] The Receiver has redacted the name of this investor and has redacted the names of all investors in the text and attachments to this report.

Under Tab 6 is a Statement of Capital Account for this investor prepared by WGTC, and sent to Westridge showing the investor's capital account at WGTC at January 31, 2009 was $50,856,854.

Under Tab 7 is a Summary of Investment Portfolio prepared by Westridge and sent to the investor showing the $50,856,853.75 open equity in WGTC as miscellaneous securities.

### Allocation of Income to WG Trading Investors, LP as a Limited Partner of WGTC

Allocation of income by WGTC to WGTI, also a limited partner of WGTC, was different from that of all other limited partners.

After the actual monthly net income was determined, it was first allocated to each of the limited partners in the method described above and the remainder, whether income or a loss, was then allocated, i.e. plugged, to WGTI. The Receiver analyzed WGTC's 2007 net income by month to prove such methodology of income allocation by WGTC.

Under Tab 8 is an Analysis of Changes in Limited Partners' Capital of WGTC for each month of 2007 for WGTC prepared by the Receiver. For all limited partners other than WGTI, the amounts for capital at beginning of each month, capital contributions, capital withdrawals, allocated monthly earnings, and capital at end of each month were obtained from the Schedules of Investor Accounts.

The actual monthly net income before allocation to limited partners was balanced to WGTC's books. Total capital contributions, capital withdrawals, and annual income for 2007 were in accordance with WGTC's audited 2007 financial statements.

In conclusion, of WGTC's 2007 net income of $101,238,715, $94,303,151 was allocated to all limited partners other than WGTI based on their open equities in WGTC, and the remainder of $6,935,564 was allocated, i.e. plugged, to WGTI. The $6,935,564 allocated by WGTC to WGTI as a limited partner also included the performance fee of $1,174,209 charged to limited partners other than WGTI. Pursuant to the Performance Allocation clause of WGTC's Limited Partnership Agreement, the $1,174,209 performance fee resulting from the $101,238,715 net income was to be allocated to the two managing general partners, Mr. Greenwood and Mr. Walsh.

The Receiver verified that WGTC's 2007 books and records did not show the allocation of the $1,174,209 performance fee as allocations of net income to the two managing general partners; instead, WGTC's 2007 books and records showed the allocation of the $1,174,209 performance fee as an allocation of net income to WGTI. Consequently, for income tax reporting purposes, the $1,174,209 performance fee was not reported by WGTC as personal income of Mr. Greenwood and Mr. Walsh.

Under Tab 9 is a Schedule of Special Allocations of WGTC's Net Income for the Ten-Year Period Ended December 31, 2008. This schedule shows that according to WGTC's audited financial statements (except for 2008 which was unaudited), fees allocated to the two general partners, Mr. Greenwood and Mr. Walsh, attributable to WGTC's net income totaled approximately $11.6 million. However, as described above, such fees were not reported by WGTC as personal income of Mr. Greenwood and Mr. Walsh.

### Distributions to the Fully-Withdrawn Investors of WGTC

Under Tab 10 is a Schedule of Contributions, Earnings, and Withdrawals of the Fully-Withdrawn Investors of WGTC for the 13-Year Period Ended December 31, 2008.

This schedule shows that for the 13-year period from 1996 to 2008, WGTC received capital contributions totaling approximately $1.89 billion from its non-current investors, allocated approximately $236 million of its income to these investors, and paid withdrawals totaling approximately $2.13 billion to these investors.

### Distributions to the Investors with Open Equities in WGTC

Under Tab 11 is a Schedule of Contributions, Earnings, and Withdrawals of the Investors with Open Equities in WGTC for the Period from May 1, 1996 to January 31, 2009.

This schedule shows that for the period from May 1, 1996 to January 31, 2009, WGTC received contributions totaling approximately $2.16 billion from its current investors, allocated approximately $340 million of its income to these investors, paid withdrawals totaling approximately $1.65 billion to these investors, which resulted in open equities in WGTC held by the current investors of approximately $851 million at January 31, 2009.

The $1.65 billion in withdrawals included the variation margin deposits advanced by WGTC on behalf of six of its current investors to their accounts maintained at Morgan Stanley and managed by Westridge. The variation margin deposits advanced by WGTC as of December 31, 2008 for the six current investors aggregated approximately $337 million.

## WG Trading Investors, LP

WGTI, formerly known as WG Trading Advisors, LP, is a limited partnership organized on August 24, 1990 under the laws of the State of Delaware. Mr. Greenwood and Mr. Walsh were the managing general partners of WGTI.

WGTI was not registered under the Securities Exchange Act of 1934 or the Commodity Futures Trading Commission Regulations.

As described below, at January 31, 2009 WGTI and its wholly-owned affiliate, WGI LLC, carried cash-convertible assets at the cost of approximately $35.4 million and cash of approximately $700,000, while its liabilities to the investors were approximately $668 million.

## Investors of WGTI and Accrual of Interest Income to WGTI's Investors

### *Investors of WGTI*

Investors invested in WGTI directly by holding senior promissory notes issued by WGTI.  They also invested in WGTI indirectly by subscribing to non-voting redeemable participating shares of Class Funds A, B, C, or R offered by Westridge Capital Management Enhancement Funds Inc., a BVI company, or by subscribing to participating shares offered by WGTC Limited, also a BVI company.  Westridge Capital Management Enhancement Funds Inc. and WGTC Limited subsequently invested in WGTI by holding senior promissory notes issued by WGTI.  In other words, all investors of WGTI, except for the one described below, were note holders of WGTI.

For purposes of determining the interest accruing and payable on the promissory notes, the index was the performance of a hypothetical investment equal in amounts to the principal of the promissory notes invested in the limited partnership interest of WGTC. In other words, the returns of investments in WGTI were computed exactly the same as that in WGTC.

### *Accrual of Interest Income to WGTI Investors*

The Schedules of Investor Accounts computed and accrued the earnings to WGTI's investors using the same method that was used for WGTC's investors. The operating procedures for WGTI's investors were also the same as those used for WGTC's investors.  They are explained using a specific investor as an example.

| | |
|---|---|
| Beginning open position | $49,005,854 |
| Less redemption | $     750,000 |
| Monthly rate of return | 0.40% |
| Monthly earnings adjusted with timing of redemption | $     194,959 |
| Ending open position | $48,450,813 |

Under Tab 12 is a Statement of Capital Account for this investor prepared by WGTI and sent to Westridge showing the investor's capital account at "WG Trading Company LP", instead of WGTI, at January 31, 2009 was $48,450,813.

Under Tab 13 is a Summary of Investment Portfolio prepared by Westridge and sent to the investor showing the $48,450,811.96 open position in WGTI as miscellaneous securities.

### One WGTI's Investor in the Limited Partner Form

There was one investor of WGTI who invested in WGTI in Limited Partner Form, unlike all others who were or are in Note Holder Form. However, monthly earnings were allocated to this investor using the same rates of return and methods as used with all other investors.

Between December 15, 1995 and October 6, 2008, this fully-redeemed investor contributed approximately $93.9 million to and redeemed approximately $137.2 million from WGTI, which resulted in earnings of approximately $43.3 million from WGTI.

### Full Redemptions by Investors of WGTI

Under Tab 14 is a Schedule of Contributions, Earnings, and Withdrawals of the Fully-Redeemed Investors of WGTI, including the one in Limited Partner Form as described above, for the 13-Year Period Ended December 31, 2008.

This schedule shows that for the 13-year period from 1996 to 2008, WGTI received approximately $1.37 billion from its fully-redeemed investors, accrued interest income of approximately $198 million for these investors, and paid redemptions totaling approximately $1.57 billion to these investors.

The source of funds for these payments is discussed below.

### Redemptions by the Investors with Open Positions in WGTI

Under Tab 15 is a Schedule of Contributions, Earnings, and Withdrawals of the Investors with Open Positions in WGTI for the Period from September 1, 1996 to January 31, 2009.

This schedule shows that for the period from September 1, 1996 to January 31, 2009, WGTI received contributions totaling approximately $2.23 billion from its current investors, accrued interest income of approximately $214 million for these investors, paid redemptions totaling approximately $1.78 billion to these investors, which resulted in open positions in WGTI held by the current investors of approximately $668 million at January 31, 2009.

The $1.78 billion in redemptions included the variation margin deposits advanced by WGTC on behalf of certain of WGTI's investors to these investors' accounts maintained at Morgan Stanley and managed by Westridge. The variation margin

deposits advanced by WGTC as of January 31, 2009 for certain of WGTI's investors aggregated to approximately $204 million.  The payment of WGTC's funds for the benefit of WGTI's investors is one example of commingled investor funds between WGTC and WGTI.  More examples of commingled investor funds are discussed below.

**Summary of WGTI's Investment in WGTC**

WGTI's capital contributions to or capital withdrawals from WGTC would increase or decrease WGTI's investment in WGTC.   In addition, WGTC's allocations of its net income or net loss to WGTI would increase or decrease WGTI's investment in WGTC.

Under Tab 16 is a Summary of Activities of WGTI's Investment in WGTC as a Limited Partner of WGTC for the Ten-Year Period Ended December 31, 2008.  This summary shows that during the ten-year period from 1999 to 2008, WGTI's net capital withdrawals in cash from WGTC were approximately $81 million.

The summary also shows that other than the $11.6 million special allocation of net income to WGTI as described above, WGTC also allocated losses totaling approximately $7.4 million to WGTI, which resulted in a $4.2 million (i.e. $11.6 million minus $7.4 million) income allocation to WGTI out of WGTC's approximately $559 million cumulative net income for the ten-year period ended December 31, 2008.

As an investor in WGTC, WGTI also should have had earnings of WGTC accrued for WGTI in the same method as they were accrued for all other investors of WGTC in the ordinary course of business.  Instead, WGTC allocated losses totaling approximately $7.4 million to WGTI in the ordinary course of business between 1999 and 2008 and specially allocated its general partners' performance/management fees to WGTI totaling approximately $11.6 million to make up for the $7.4 million allocated losses.

**Payments to or for the Benefit of Mr. Greenwood and Mr. Walsh and their Affiliates and Family Members**

Under Tab 17 is a Summary of WGTI's Payments to or for the Benefit of Paul Greenwood and his affiliates and family members. This schedule shows that WGTI paid approximately $80 million to or for the benefit of Mr. Greenwood between January 1, 1999 and February 6, 2009.

Under Tab 18 is a Summary of WGTI's Payments to or for the Benefit of Stephen Walsh and his affiliates and family members.  This schedule shows that WGTI paid approximately $51 million to or for the benefit of Mr. Walsh between January 1, 1999 and January 9, 2009.

In total, WGTI paid approximately $131 million to or for the benefit of Mr. Greenwood and Mr. Walsh and their affiliates and family members between January 1, 1999 and February 6, 2009.

These payments were first recorded as employee advances and then reclassified to notes receivable upon signing of the promissory notes by Mr. Greenwood and Mr. Walsh.

**WGTI's Notes Receivable due from Mr. Greenwood and Mr. Walsh**

Under Tab 19 is a Schedule of Notes Receivable and Employee Advances due from Paul Greenwood and Stephen Walsh.  This schedule shows that outstanding notes receivable due from Mr. Greenwood and Mr. Walsh to WGTI totaled approximately $553 million.

The difference between a note receivable balance resulting from employee advances for a particular year and the actual cash paid during that particular year to or for the benefit of the two individual defendants generally represented the capitalization by WGTI of interest expense, i.e. investors' earnings, paid to or accrued for the note holders.  The capitalization itself was an accounting entry which did not result in any actual payments to or for the two individual defendants.  WGTI did not have the revenue to pay interest expense.  The only possible sources for interest payments were WGTC funds or new WGTI investor funds.  Therefore, the capitalization of interest expense into notes receivable means that the two individual defendants were supposed to pay back funds diverted from WGTC or other WGTI investors.

Under Tab 20 is a Comparison of Notes Receivable Balances and Payments to the Two Individual Defendants for Years 1999 to 2007. Promissory notes signed by Mr. Greenwood and Mr. Walsh as of January 2, 2008 were for financial activities conducted as of December 31, 2007.   The comparison shows that employee advances in connection with the two individual defendants incurred between 1999 and 2007 aggregated to approximately $458 million, while total payments by WGTI to or for the benefit of the two individual defendants and their affiliates and family members aggregated to approximately $122 million, which resulted in a variance of approximately $336 million to be accounted for.

By analyzing the variance by year, the Receiver determined that other than the capitalization of interest expense described above, the $336 million variance was caused primarily by a $61,708,541 adjustment made in 2000 and a $30 million adjustment made in 2002.  These two adjustments are described in the following two paragraphs.

Under Tab 21 is a WGTI's accounting record showing that WGTI recorded an "income from SIA" of $61,708,541.41 and recorded the same amount as employee advances, an asset account.  This $61,708,541.41 adjustment represented the write-off by WGTI of expenses and loan guaranties ultimately paid by WGTI in connection with Signal

Apparel Company, Inc., a company with which WGTC and WGTI had investing and financing activities totaling approximately $198 million, excluding any other open market trading in Signal Apparel Company, Inc. by WGTC or WGTI.

Under Tab 22 is a WGTI's accounting record showing that WGTI capitalized its write-off of an investment in an affiliate, WG Set Partners. WG Set Partners invested $990,500 in Software Emancipation Technology, Inc. and recognized an unrealized gain of $29,009,500, which totaled $30 million. Subsequently, WG Set Partners wrote off its investment in Software Emancipation Technology, Inc. which caused WGTI to write off its investment in WG Set Partners and to capitalize the loss as notes receivable due from Mr. Greenwood and Mr. Walsh.

**WGTI's Cash Receipts and Disbursements**

Under Tab 23 is a Preliminary Summary of WGTI's Cash Receipts and Disbursements for the Period from January 1, 1999 to February 25, 2009 compiled by the Receiver. Under Tab 24 is a detailed Schedule of WGTI's Cash Receipts and Disbursements for the Period from January 1, 1999 to February 25, 2009 prepared by the Receiver.

To complete the summary and schedule regarding WGTI's cash flows, the Receiver relied on the information contained in the Schedules of Investor Accounts as well as the backup documents obtained from the defendants' accounting department.

The Receiver's forensic reconstruction of WGTI's cash receipts and disbursements unveiled extensive commingling of investor funds and revealed other irregular financial matters discussed below.

*Examples of Commingled Funds*

- WGTI received approximately $1.27 billion from WGTC and paid approximately $973 million to WGTC, which resulted in net receipts of approximately $295 million from WGTC.

  As described above, WGTI's net withdrawals of capital in cash from WGTC were approximately $81 million between 1999 and 2008. Between January 1, 2009 and February 25, 2009, WGTI transferred approximately $42 million to WGTC, which reduced the $81 million sum to $39 million.

  The $256 million difference (i.e. $295 million minus $39 million) may represent return by WGTC to WGTI of contributions of WGTI's investors received by WGTC.

- Contributions by WGTI's note holders were not in every instance received directly by WGTI, but were instead received on several occasions first by WGTC and then transferred to WGTI.

- WGTC received $105 million from four of its limited partners on February 22, 2007 and transferred the funds to WGTI on February 23, 2007. Subsequently, WGTI transferred the funds back to WGTC on April 26, 2007.

   The purpose of this transaction is not clear as WGTI did not have a shortage of funds available for immediate use between February 23, 2007 and April 26, 2007. However, the $105 million contributions from the four limited partners of WGTC were not invested in the commodity pool between February 23, 2007 and April 26, 2007.

- WGTC transferred $20 million to WGTI on June 15, 2007. WGTI returned $3 million back to WGTC on July 3, 2007 and paid $17 million directly to a limited partner of WGTC on July 5, 2007.

   The purpose of this transaction is not clear, as both WGTC and WGTI did not have shortage of funds available for immediate use in June and July of 2007.

- WGTI received fee income from Westridge totaling approximately $33.8 million, of which $1,282,984.93 was received on August 29, 2008. "XXXX[6] incentive 2008" was shown on the memo line of the $1,282,984.93 check issued by Westridge (Tab 25). The redacted memo line on this check shows the fee payment was connected to a limited partner of WGTC.

- WGTI paid $60 million to one of its note holders on July 10, 2000. WGTC paid the $63,282,856.99 final redemption to this note holder of WGTI on August 10, 2000, as WGTI's balance of funds available for immediate use at August 10, 2000 was only approximately $22.7 million.

- WGTI paid $200 million to a limited partner of WGTC on July 5, 2005, as the WGTC's balance of funds available for immediate use at July 5, 2005 was only approximately $127 million.

- WGTI paid $937,791.94 and $50 million to a limited partner of WGTC on July 31, 2003 and April 29, 2005, respectively.

- WGTI paid $50,642,000 to four limited partners of WGTC between April 18, 2005 and January 18, 2008.

---

[6] The investor's name has been redacted.

- WGTI paid $3,025,000 to two limited partners of WGTC on January 18, 2008.

- WGTI paid $315,500 to two limited partners of WGTC between January 16, 2008 and January 18, 2008.

- Contributions by WGTC's limited partners were not in every instance received directly by WGTC, but were instead received on several occasions first by WGTI and then transferred to WGTC.

- When WGTI's balance of funds available for immediate use was approximately $8 million, it received $76.5 million from a limited partner of WGTC on July 3, 2008.

  Between July 4, 2008 and August 1, 2008, WGTI paid $22.5 million to its note holders, paid approximately $727,000 to and for the benefit of Mr. Greenwood and Mr. Walsh, and received $2 million from one of its investments, which brought the balance of funds available for immediate use to approximately $63 million.

  On August 1, 2008, WGTI also received $42,731,035.66 from WGTC, which represented the transfer of a final capital withdrawal by a WGTC limited partner to convert into being solely a note holder of WGTI. This receipt of funds from a note holder enabled WGTI to return on August 4, 2008 to WGTC the $76.5 million it received from a WGTC limited partner on July 3, 2008.

Based upon the above, it is clear that the investor funds were commingled between WGTC and WGTI. There were instances in which limited partners' funds were received by WGTI while note holders' funds were received by WGTC, and limited partners were paid by WGTI while a note holder was paid by WGTC. In addition, WGTC advanced the variation margin deposits on behalf of certain note holders of WGTI.

*Other Financial Matters*

- Net payments by WGTI to WGI LLC, a wholly-owned affiliate of WGTI, were approximately $14 million. WGI LLC is discussed in detail below.

- WGTI paid approximately $32 million to purchase Treasury bills between January 7, 1999 and July 24, 2000. The purchase of Treasury bills was connected to WGTC's investing and financing activities with Signal Apparel Company, Inc. which is discussed in detail below.

**WGI LLC**

WGI LLC (WGI) is a wholly-owned affiliate of WGTI organized on October 1, 1997 under the laws of the State of Connecticut.

Under Tab 26 is a Statement of WGTI's Noncash Capital Contributions to WGI and WGI's Cash Receipts and Disbursements for the Period from January 1, 1998 to December 31, 2008.

This statement shows that WGTI made noncash capital contributions to WGI of its holdings of common stock of, receivables due from, and bank loan guaranties paid for Signal Apparel Company, Inc. totaling approximately $96.2 million.  Signal Apparel Company, Inc. is discussed in detail below.  The statement also shows that WGTI made non-cash capital contributions to WGI of its holdings of certain partnership interests and equity securities totaling approximately $3.8 million.  In total, WGTI made non-cash capital contributions to WGI totaling approximately $100 million.

In addition, WGTI made capital contributions to WGI in cash totaling approximately $14 million, which was used by WGI for investments in marketable securities, including purchase of 1,633,100 common shares of Signal Apparel Company, Inc. between 1998 and 2000 totaling approximately $1.5 million.  As of December 31, 2008, the entire investments made by WGI using the cash received from WGTI were almost lost completely, which left a cash balance of approximately $138,000 at December 31, 2008.

On December 31, 2007 WGI wrote down its financial interests in Signal Apparel Company, Inc. from a carrying value of approximately $94 million to $74 million which was still being carried on WGI's books at December 31, 2008.

**Consolidated Statement of Financial Condition of WGTI and WGI**

Under Tab 27 is the Consolidated Statement of Financial Condition of WGTI and its Wholly-Owned Affiliate, WGI at December 31, 2008 and January 31, 2009.

This statement shows that other than cash and receivables due from Mr. Greenwood and Mr. Walsh, the assets with realizable values are an investment in a commodity pool with a carrying value of approximately $27 million, investments in real estate with carrying values totaling approximately $7.7 million, an investment in an equity security with a carrying value of approximately $500,000, and a receivable due from an investment advisor with a carrying value of approximately $200,000, which totaled approximately $35.4 million.

These assets with realizable values are discussed in detail below.

WGTI paid $150,000 and $20,000 for the benefit of Mr. Greenwood to Bookstream Inc. in 2002 and 2007, respectively.  On December 22, 2008, WGTI paid $1,366,287.05 to a bank to pay off a mortgage loan on behalf of Bookstream Inc.

Although the $1,366,287.05 sum was not capitalized on WGTI's books, the Receiver will demand Bookstream Inc. to repay the loaned amount to the Receivership Estate.

## WGTC's Investing and Financing Activities with Signal Apparel Company, Inc.

### General

Signal Apparel Company, Inc. (SIA) was an Indiana corporation with its common stock listed on the New York Stock Exchange.  SIA was engaged in manufacturing and marketing activewear in juvenile, youth and adult size ranges and upscale knit apparel for the ladies market.

The independent auditor's report dated March 26, 1997 on the 1996 consolidated financial statements of SIA and subsidiaries included an explanatory paragraph concerning substantial doubt about SIA's ability to continue as a going concern (Tab 28, page 1).  The 1996 Annual Report of SIA disclosed SIA's liquidity problems and the required financial support by Mr. Walsh and Mr. Greenwood (Tab 28, page 2).  It also showed that Mr. Greenwood and Mr. Walsh were the directors of SIA (Tab 28, page 3).

The Receiver has located the following agreements dated March 12, 1999 and executed by WGTC, except for the Guaranty Agreement which was executed on March 17, 1999, in connection with loans granted to SIA by Bank of New York (assumed by GMAC subsequently) and GMAC:

> Guaranty Agreement
> Limited Guaranty Agreement
> Limited Recourse Guaranty Agreement
> Equipment Cash Deposit Agreement
> Cash Deposit Agreement (Tab 29)

SIA filed a Chapter 11 bankruptcy petition in the U.S. Bankruptcy Court on September 22, 2000 and that proceeding was terminated on April 4, 2002.  As of July 12, 2007, SIA's common stock was quoted on the Pink Sheets and had two market makers.  The SEC revoked SIA's registration in September 2007.

**WGTC's Trading of SIA Common Stock in Open Market**

Under Tab 30 is a Summary of WGTC's Purchase and Sale of Common Stock of SIA. This summary shows that WGTC began trading SIA's common stock in the open market during 1991.  Between 1991 and 2000, WGTC purchased 3,289,899 common shares of SIA for approximately $29.7 million and sold 2,780,499 common shares of SIA for approximately $25.3 million, which resulted in 509,400 unsold shares with a purchase cost totaling approximately $4.6 million.  This loss of approximately $4.6 million was allocated by WGTC solely to one of its limited partners, WGTI.

**WGTC's Financing and Investing Activities with SIA Prior to November 30, 1997**

Under Tab 31 is a Summary of Payments by WGTC, WGTI and WGI in Connection with SIA and subsidiaries for the Period from November 30, 1997 to September 3, 2002 prepared by the Receiver and supporting documents the Receiver obtained from Greenwich office.

This summary shows that WGTC's non-open market financing and investing activities conducted prior to November 30, 1997 in connection with SIA and its subsidiaries totaled approximately $74.2 million and was comprised of the following:

|  | (In Millions) |
|---|---|
| Interest receivable | $  5.7 |
| Dividends receivable | 1.5 |
| Receivable due from American Marketing |  |
|    Works, Inc., a subsidiary of SIA | 1.0 |
| Common stock of SIA | 1.5 |
| SIA stock warrants exercised | 16.4 |
| Preferred stock of SIA | 17.8 |
| Notes receivable due from SIA | 30.3 |
|  |  |
| Total | $ 74.2 |

After the financial restructuring arrangement with SIA, the original structure of the $74.2 million sum was realigned on November 30, 1997 as follows:

|  | Structure | |
| --- | --- | --- |
|  | Original | Realigned |
|  | (In Millions) | |
| Interest receivable | $ 5.7 | $ - |
| Dividends receivable | 1.5 | - |
| Receivable due from American Marketing Works, Inc., a subsidiary of SIA | 1.0 | - |
| Common stock of SIA (from 488,400 shares to 13,118,400 shares) | 1.5 | 20.3 |
| SIA stock warrants exercised | 16.4 | - |
| Preferred stock of SIA | 17.8 | 45.4 |
| Notes receivable due from SIA | 30.3 | 8.5 |
| Total | $74.2 | $74.2 |

The approximately $74.2 million restructured investments in equity and debt securities of SIA were transferred by WGTC to WGTI by charging WGTI's capital in WGTC for the same amount and WGTI in turn transferred the securities to WGI as non-cash capital contributions.

**WGTC and WGTI Advanced Funds to SIA after the March 26, 1997 Auditor's Report on SIA's Financials and before the September 22, 2000 Chapter 11 Bankruptcy Filing by SIA**

The summary under Tab 31 shows that WGTI advanced $11,470,000 to SIA between December 1997 and August 2000. The summary also shows that WGTC advanced $350,000 to SIA in 1999 and transferred the resulting receivable to WGTI by charging WGTI's capital in WGTC for the same amount. WGTI in turn transferred the receivable to WGI as non-cash capital contribution.

In total, between December 1997 and August 2000, WGTI advanced $11,820,000 directly and indirectly to SIA.

**WGTC and WGTI Paid Expenses of SIA after the March 26, 1997 Auditor's Report on SIA's Financials**

The summary under Tab 31 shows that WGTC paid $2.1 million for an SIA expense in April 1999 and transferred the resulting receivable to WGTI by charging WGTI's capital

in WGTC for the same amount.  WGTI in turn transferred the receivable to WGI as non-cash capital contribution.

WGTC paid $28,000 for another expense of SIA in October 2000.  WGTI reimbursed $28,000 to WGTC.

In addition, between July 2000 and February 2001, WGTI paid expenses of SIA totaling approximately $799,000.

In total, between April 1999 and February 2001, WGTI paid expenses of SIA directly and indirectly totaling approximately $2.9 million.

### WGTC and WGTI Purchased Treasury Bills and Made Cash Deposits Serving as Guaranties for SIA's Bank Loans after the March 26, 1997 Auditor's Report on SIA's Financials

The summary under Tab 31 shows that WGTC purchased Treasury bills and made cash deposits in 1999 totaling approximately $29 million to guarantee SIA's bank loans.  The Treasury bills and the cash deposits were transferred by WGTC to WGTI by charging WGTI's capital in WGTC for the same amount.

In addition, WGTI also purchased Treasury bills and made cash deposits between 1998 and 2000 totaling approximately $53 million to guarantee SIA's bank loans.

SIA defaulted on the loans and the guaranties together with interest income were forfeited to setoff against the loans.  In total, between 1998 and 2000, WGTI purchased Treasury bills and made cash deposits, directly and indirectly, totaling approximately $82 million on behalf of WGTC to guarantee SIA's bank loans.

### WGTI's Payments to GMAC after SIA's Chapter 11 Bankruptcy Filing on September 22, 2000

The summary under Tab 31 shows that on behalf of WGTC, WGTI paid $476,000 and $25 million to GMAC on January 28, 2002 and September 3, 2002, respectively, which totaled $25,476,000. The $25 million payment to GMAC on September 3, 2002 was made by WGTI but "REF: WG Trading Co LP" was shown on the Wire Funds Transfer Request.

WGTI recorded the $25 million payment to GMAC on September 3, 2002 as notes receivable due from Mr. Greenwood and Mr. Walsh.

**WGI Purchased Common Stock of SIA after the March 26, 1997 Auditor's Report on SIA's Financials**

The summary under Tab 31 shows that WGI used the capital contributions in cash by WGTI to purchase 1,633,100 common shares of SIA for approximately $1.5 million between December 1998 and April 2000.

**Summary of Payments by the Receivership Defendant entities in connection with SIA**

Total payments by the Receivership Defendant entities in connection with SIA amounted to approximately $198 million, of which approximately $105.5 million, $91.0 million and $1.5 million were paid directly by WGTC, WGTI and WGI, respectively.

The $198 million in total payments was comprised of the following:

|  | (In Millions) |
|---|---|
| Non-open market financing and investing activities conducted between WGTC and SIA prior to November 30, 1997 | $   74.2 |
| Purchase of Treasury bills and deposits of cash serving as guaranties of SIA's bank loans | 82.0 |
| Payments made directly to GMAC | 25.5 |
| Subtotal | 181.7 |
| Advances to SIA | 11.8 |
| Payments of SIA expenses | 3.0 |
| Purchase of SIA common stock | 1.5 |
| Total | $ 198.0 |

As described above, the guaranty and cash deposit agreements in connection with SIA bank loans were all executed by WGTC.  Therefore, the $107.5 million payments (i.e. $82.0 million plus $25.5 million) made by the Receivership Defendant entities in connection with SIA's bank loans should have been made solely by WGTC.

In addition, the $74.2 million sum in connection with WGTC's non-open market financing and investing activities with SIA was the sole responsibility of WGTC.

In summary, at least $181.7 million (i.e. $107.5 million plus $74.2 million) of the $198.0 million total payments made by the Receivership Defendant entities in connection with SIA should have been treated as an operating loss of WGTC and should have been allocated not just to WGTI, but to all limited partners of WGTC.

Based on the discussion above, the $181.7 million loss was ultimately paid by WGTI, of which $102.9 million (i.e. the $74.2 million restructuring at November 30, 1997 plus the $28.7 million guaranties paid by WGTC and transferred to WGTI) was charged by WGTC solely against WGTI's capital in WGTC and the remaining $78.8 million (the $53.3 million guaranties paid directly by WGTI plus the $25.5 million paid directly by WGTI to GMAC) was absorbed by WGTI itself.

In conclusion, the investors of WGTI paid at least $181.7 million of WGTC's loss, which should have been allocated to all investors of WGTC.

## The Operations of WGTI had the Elements of a Classic Ponzi Scheme

Under Tab 32 is a Statement of Cash Shortfall in WGTI's Operations. This statement shows that between January 1, 1999 and February 25, 2009, WGTI had income of approximately $70 million.

During the same period, WGTI made payments of investors' earnings, i.e. interest expense of WGTI, to the fully-redeemed note holders of approximately $153.5 million, payments to or for the benefit of Mr. Greenwood and Mr. Walsh and their affiliates and family members of approximately $130.5 million, payments in connection with SIA totaling approximately $33.8 million, payments for operating expenses totaling approximately $23.0 million, and payments for investments and loans totaling approximately $40.7 million, which totaled approximately $381.5 million.

Consequently, WGTI had a cash shortfall, at minimum, of approximately $311.5 million (i.e. $381.5 million minus $70 million) between January 1, 1999 and February 25, 2009. This shortfall is likely conservative because it does not include any interest income included in the redemptions paid to the current investors.

Between January 1, 1999 and December 31, 2008, WGTC's net income aggregated to approximately $559 million, out of which approximately $219 million was distributed to the fully-withdrawn limited partners as distribution of income, which nets to approximately $340 million (i.e. $559 million minus $219 million).

Based upon the above, it is obvious that WGTI's cash shortfall during this period was financed by either WGTC's or WGTI's current investors. Payments to the fully-redeemed or current investors by WGTI were out of the funds paid in by the subsequent investors, rather than from net revenues generated by WGTI's operations.

## Summary of Open Equities of WGTC's Limited Partners and Open Positions of WGTI's Note Holders

Under Tab 33 is a Preliminary Schedule of Investors' Open Equities in WGTC and Open Positions in WGTI at January 31, 2009. This schedule shows that at January 31, 2009, open equities of WGTC's limited partners in WGTC as carried on WGTC's books and records and open positions of WGTI's notes holders in WGTI as carried on WGTI's books and records were $851,438,991 and $667,702,540, respectively, which totaled $1,519,141,531.

## Assets held by the Individual Defendants and Relief Defendants

The Receiver has not yet received a verified written accounting of their assets from the individual defendants, other than the limited accounting provided to the Court by Mr. Greenwood and Mr. Walsh. The Receiver has been able to confirm the existence of many of the assets; however, investigation as to the location and extent of assets in the form of loans or investments in various business entities is continuing. The Receiver's forensic accounting will continue to provide the Receiver with useful information in tracing additional assets.

## Assets in the Name of Paul Greenwood

On March 23, 2009, the Receiver conducted a site visit of the Greenwood residence, accompanied by Mr. & Ms. Greenwood and their respective counsel. A photographic inventory was made of the residence as well as the antiques and other valuable collectibles. Below is a brief description of the assets held by Mr. Greenwood. The following information is also based on the limited financial disclosure filed by Mr. Greenwood with the Court and based on the Receiver's initial review of the business and personal records located at the business premises of the Receivership Defendants.

### 14 & 16 Wheeler Road, North Salem, NY

The Greenwood residence is a palatial estate constructed on the crest of a large landscaped hill situated on 9.11 acres overlooking a lake. There are three adjacent parcels, each containing a home. The Greenwoods reside at the large estate home at 16 Wheeler Road. The home at 14 Wheeler Road, situated on 2.81 acres is currently vacant. Both properties are owned jointly by Mr. & Ms. Greenwood. Mr. Greenwood lists the values of these two homes as $9.0 million and $1.0 million respectively.

The other two parcels at 20 and 22 Wheeler Road respectively both contain large homes that are titled in the name of Robin Greenwood. 20 Wheeler Road is a single-family residence situated on 7.02 acres and 22 Wheeler is also a single-family residence situated on 2.81 acres of land. One home is vacant and the other home is being rented by a

friend of the family.  Ms. Greenwood has not provided the Receiver an estimate of value for these two homes.

The Receiver has made arrangements to engage two local appraisal firms to appraise each of these four residences.  The appraisal firms have also been engaged to appraise the personal residence of Stephen Walsh and the pony farm owned by Grand Central Inc.

The Receiver has worked closely with counsel for Mr. and Ms. Greenwood to review various bills associated with these four properties.  The Receiver has arranged to pay the current tax liabilities on the properties and will continue to cooperate with counsel to ensure that expenses designed to preserve these assets will continue to be paid by the Receiver.

## Antiques and Collectibles

Mr. Greenwood estimates the value of the antiques and personal property in his primary residence to be worth $9.5 million.  The Receiver took a photographic inventory of the property and has reviewed schedules listing various collectibles and documents prepared by Mr. Greenwood and presented to an insurance carrier to secure coverage on the personal property.  A listing of the collectibles the Receiver recovered from Mr. Greenwood's computer is under Tab 34.

Included in the personal property are jewelry, furniture, rugs, sculptures, paintings and rare books that were purchased for approximately $5,449,430.00.  The Receiver has not had this property appraised.

In addition to these assets, Mr. Greenwood has a collection of 1,348 teddy bears.  The individual value of at least one of the bears is reportedly in excess of $100,000.00.  The Receiver has contacted an expert in these types of collectibles, but has not yet engaged the expert to appraise the teddy bear collection and advise the Receiver of the current market for this type of collectible.  The Receiver recovered a database of the teddy bears from Mr. Greenwood's computer.  Mr. Greenwood confirmed to the Receiver that the database was an accurate listing of the teddy bears.  A listing of each of the teddy bears contained in Mr. Greenwood's database is under Tab 35.  According to the database, the cost of the teddy bears exceeded $3.0 million.  The value of the teddy bear collection as listed on an asset list presented to the insurance carrier was $2,205,014.

Mr. Greenwood has expressed a desire to work in conjunction with the Receiver to liquidate the collectibles and fine arts.  The Receiver is prepared to consult with experts and oversee the liquidation of any personal and real property assets.

**Cash Deposited with Defense Counsel**

Reportedly, Mr. Greenwood cashed out a life insurance policy and deposited approximately $903,000 with his former legal counsel.  On March 27, 2009, the Receiver made demand on the law firm to return these funds to the Receivership Estate.  On April 7, 2009, the firm responded to the Receiver by claiming that the current Orders do not require the firm to return the funds, but that they were returning $787,766 of the funds because their client had no objection to the funds being turned over to the Receiver.  The law firm did retain $115,234 in their escrow account for their claim for outstanding services rendered.  They represented that they will not draw down the escrow funds during the pendency of the Temporary Restraining Order.

**Limestone Boat**

Mr. Greenwood owns a 1994 24-foot Limestone boat.  The Court recently issued a "so ordered" letter for the sale of the boat.  The boat was sold on May 6, 2009 for $32,500. After payment of a sales commission and a minor commissioning fee, the net return to the Receivership Estate was $29,886.50.

## Assets in the Name of Stephen Walsh

On March 24, 2009, the Receiver conducted a site visit of the Walsh residence.  A photographic inventory was made of the residence as well as the personal property in the home.  Below is a brief discussion of the assets held by Mr. Walsh and several business entities in which he either holds an equity position or otherwise loaned to, or invested money with the entity.  It should be noted that some of the assets included in the section have been identified as assets held in the name of SAM Group LLC (SAM), which the Receiver understands to be owned 94% by Mr. Walsh and 2% each by his three children.  The following information is also based on the limited financial disclosure filed by Mr. Walsh with the Court and based on the Receiver's initial review of the business and personal records located at the business premises of the Receivership Defendants.

**7 Half Moon Bay, Sands Point, New York**

Mr. Walsh's residence is a water-front estate with a full view of the city of New York. Some limited interior construction work is currently underway on the two-story home. The backyard is beautifully landscaped with a balcony, gazebo, pool, Jacuzzi and other sitting areas.  The residence was appraised in 2007 for approximately $8.0 million.  As discussed above, the Receiver has made arrangements to get two current appraisals on this property.

The Receiver conducted a photographic inventory of the contents of this residence and identified only a few fine art and collectible items.  It appeared that some pictures had

been removed, but the interior design of the home did not appear to include a lot of high valued collectibles.

The Receiver has paid the current tax liabilities on this property and will continue to cooperate with counsel for Mr. Walsh to ensure that expenses designed to preserve this asset will continue to be paid by the Receiver.

## SAM Group LLC

The Receiver understands that Mr. Walsh owns 94% of SAM and his three children own 2% each. Mr. Walsh listed the value of investments, loans, securities and cash deposits held in the name of SAM Group as $6,581,397. Through a review of documents located at the WG Trading premises, review of financial documents and personal interviews, the Receiver has been able to confirm the location and current value of many of the specific holdings of SAM but continues to investigate the nature and extent of various other investments or loans made by SAM.

### *Equity Position in Orion Capital Management, L.L.C. ("OCM")*

OCM is a registered investment advisor to Orion Constellation Partners L.L.C. ("OCP"), a private fund that engaged OCM as its investment adviser. OCP is managed by its managing member, Sirius Capital Management, L.L.C. ("Sirius"). Fifty percent of the equity interest in each of OCM and Sirius is owned by SAM. SAM loaned $764,333 to OCM, and $764,333 is still due. WGTI loaned OCM $986,000. The outstanding balance on this loan is $175,000. The Receiver has not yet determined the value of the equity position of SAM in OCM, but believes the value may be little more than the remaining balance on the loans made by SAM and WGTI. Mr. Walsh and Mr. Greenwood have made significant investments in OCP through WGTI, which will be discussed in greater detail later in this report.

### *PWG Oakmont Holdings LLC*

Stephen Walsh has actively invested in a series of real estate projects over the past fifteen years. Mr. Walsh would provide the capital to acquire properties and to fund the soft costs of obtaining certain entitlements and then either sell the property or maintain an equity ownership position in the project as a limited partner. Based on a review of documents located at the WG Trading offices, the Receiver was able to identify real estate companies that had partnered with SAM in a number of projects. The Receiver contacted these companies and made arrangements to interview the principals.

The Pearson Partners are real estate experts that used investment money from Mr. Walsh to complete a successful project called PWG Capital Prime Outlets. SAM invested between one and two million dollars to acquire the property. Pearson Partners

successfully liquidated the asset in 2004 and SAM received its initial investment plus a profit of approximately $3.0 million.

PWG Oakmont Holdings LLC was a second project designed to acquire a portfolio of retail shopping centers around Pittsburgh, Pennsylvania. Initially, WGTI paid $10.0 million, of which, $9.0 million has been repaid. WGTI paid another $1.0 million to the LLC. WGTI's books carry an investment in PWG Oakmont Holdings at the cost of approximately $1.4 million. Mr. Walsh also listed PWG Oakmont Holdings as one of the assets held by SAM with a carrying value of $700,000. There are approximately 20 other limited partners in PWG Oakmont Holdings LLC. The Pearson Partners manage the day-to-day operations of the real estate holdings. For the most part, the properties are leased out and are operating well given the current market conditions. The Receiver has requested that any scheduled distributions for the benefit of SAM be turned over to the Receiver as a Receivership Estate asset pending further order from this Court.

Other real estate investments made by Mr. Walsh and Mr. Greenwood in Delaware Land Associates will be discussed in greater detail later in the report.

### Loan to CM Group, LLC

CM Group, LLC is the parent holding company for a franchisee of five Moe's Southwest Grill Restaurants. Each of these restaurants is a single-member LLC. The CM Group, LLC also has a 20% interest in a fifth restaurant, which opened in March 2009, located in Woodbury, New York. Mr. Walsh's children, Michael Walsh, Andrew Walsh and Sarah Walsh, are partners of CM Group, LLC. Michael Walsh is the full-time managing member for these restaurants, and receives a guaranteed payment for his full-time services. The SAM accounting provided by Mr. Walsh showed a $900,000 loan to CM Group, LLC. However, the Receiver learned from a discussion with the CPA, who performs the back office accounting and administrative work on a daily basis and prepares tax returns for the entity, that the promissory note between the CM Group, LLC and the SAM Group, LLC dated April 1, 2008 is actually $1,580,000. There were additional loans that were not accounted for when the promissory note was prepared. The note payable reported on the financial statements for the year ended December 28, 2008 is $1,610,905. According to the CPA, the $1,580,000 loan was to be reduced to $900,000 as a gift of $600,000 by Mr. Walsh to Michael Walsh in an estate planning transaction. Upon learning of the action filed by the CFTC and the SEC, the CPA decided not to complete the gift transaction.

### Loan to Moe's Oceanside LLC

The SAM accounting provided by Mr. Walsh showed a $190,000 loan to this entity, which is consistent with the amount due to SAM Group LLC in the Balance Sheet as of March 22, 2009 for this entity, provided by the CPA. This loan was not shown in the CM Group, LLC's Consolidated Financial Statements for the years ended December 28,

2008, December 30, 2007 and December 31, 2006.  The Receiver does not have any other details about this loan.

### Metbank Holding Corp.

The SAM accounting provided by Mr. Walsh showed an investment of $142,974 in Metbank Holding Corp.  Documents located at WG Trading offices show that $200,000 was invested in this entity in 2002.  A document dated December 23, 2005 shows a partial redemption of Class A Preferred Stock along with a partial return of capital and a dividend.  That document shows 9,681.4 remaining Preferred Stock shares.

The Receiver is in discussions with Metbank Holding Corp. in an effort to determine the ultimate realizable value of this asset.

### Loan to Gabriel LLC

The SAM accounting provided by Mr. Walsh showed a $100,000 loan due from Gabriel LLC.

The Receiver has located documents regarding two entities with the name "Gabriel": (1) Gabriel Real Estate Group LLC and (2) Gabriel Bowery, LLC.

Gabriel Real Estate Group LLC is a real estate consulting company with Andrew Walsh as the managing member and Stephen Walsh as the advisor.  A December 8, 2008 letter issued by SAM stated that SAM would pay Gabriel Real Estate Group LLC $6,000 a month as an interim consulting fee.  In addition, SAM paid $50,000 and $76,875 to Gabriel Real Estate Group LLC on March 3, 2008 and April 25, 2008, respectively. SAM also paid certain legal fees on behalf of Gabriel Real Estate Group LLC.

Gabriel Bowery, LLC was formed under the laws of the State of New York on June 27, 2008 with Andrew Walsh as the managing member.  WGTI wire transferred $3 million to Gabriel Bowery, LLC on August 20, 2008 (Tab 36, page 1) and received $2 million back from Gabriel Bowery, LLC on August 29, 2008 (Tab 36, page 2).  The $1 million net payment to Gabriel Bowery, LLC was recorded by WGTI as employee advances due equally from Mr. Greenwood and Mr. Walsh, i.e., $500,000 each.

On August 29, 2008 Gabriel Bowery, LLC wire transferred $500,000 to Mr. Greenwood (Tab 36, page 3).  Therefore, Mr. Walsh has a $500,000 interest and Mr. Greenwood has no interest in Gabriel Bowery, LLC.

The Receiver did not locate documents specifically for the entity titled Gabriel LLC. However, the Receiver has located bank documents regarding four other entities with the name "Bowery": (1) Bowery Spring Gabriel/GA LLC, (2) Bowery Spring Mezzco LLC, (3) Bowery Spring Holdco LLC and (4) Bowery Spring Propco LLC.

The Receiver will conduct further investigation regarding the "Gabriel" and "Bowery" entities to determine Stephen Walsh's interest in these entities.

### Journal Square Properties

The SAM accounting provided by Mr. Walsh showed an investment of $250,000 in Journal Square Properties. A document located at WG Trading offices shows this investment was made in 2005. The Receiver was able to contact and interview a representative of Journal Square Properties and was advised that SAM is a limited partner. Journal Square is a real estate development firm that recently acquired a 200,000 square foot Class C office building and is currently upgrading the property into a Class B office building. Journal Square has invested $10.0 million for acquisition and construction costs. The building is approximately 60% occupied and rental income is covering all construction and operating costs.

The managing member estimates it will take approximately three years to complete construction, rent the remaining units and stabilize rents, at which time the property would be sold and a distribution would be made to the various partners. The Receiver confirmed that no distributions were scheduled for several years and the funds were essentially frozen in place.

### Inner Imaging LLC

The SAM accounting provided by Mr. Walsh showed an investment of $131,000 in Inner Imaging LLC. Documents located at WG Trading offices show that $100,000 was invested in 2001 and $31,000 was invested in 2003.

Inner Imaging is a health care facility offering preventative care to over 47 labor unions by screening patients for coronary artery disease. SAM is one of 56 limited partners that invested in the startup company. The only distribution to investors was based on two promissory notes for financing to obtain imaging equipment from a failed bank and to open a second office. No distributions are scheduled to be made to SAM and Inner Imaging is cooperating with the Receiver.

### Locust Wood Capital Advisors

The SAM accounting provided by Mr. Walsh showed an investment of $351,791 in Locust Wood Capital Advisors. A document located at WG Trading offices show SAM became a limited partner in this entity in 2004. In addition, WGTI wire transferred $336,778.80 to "Locust Wood Capital" on January 23, 2007 and recorded the payments as professional fee expenses.

Locust Wood is an equity fund with 110 limited partners.  The value of SAM's investment as of March 31, 2009 was listed at $344,946.00.  Representatives of Locust Wood are cooperating with the Receiver.  SAM has not made a redemption request and Locust Wood understands that the funds are to remain frozen pending further order of this Court.

### Note Receivable due from Andrew Walsh

A document located at WG Trading offices shows a 2007 draft promissory note of $175,000 from Mr. Walsh to Andrew Walsh.  The draft note is interest only for 30 years. The principal is payable at maturity. The Receiver has not verified if this loan was actually made.

## Joint Assets in the Names of Paul Greenwood and Stephen Walsh

Based on business and financial documents located at the offices of the Receivership Defendants, investigations by the Receiver seeking records from third parties and interviews with individuals, the Receiver has determined that the individual defendants have made a number of significant investments jointly through WGTI and hold substantial assets in the names of various other limited liability companies.

### Investment in Orion Constellation Partners L.L.C. ("OCP")

As discussed above, SAM is a member with a 50% equity position in OCM, the investment advisor for OCP.  Mr. Walsh and Mr. Greenwood hold their interest in various securities in OCP in the name of K&L Investments, LLC.  Between January 3, 2006 and July 2, 2007, WGTI, on behalf of K&L Investments, contributed $180 million to OCP.  During 2008, WGTI, on behalf of K&L Investments, received distributions from OCP of $140,900,000.  During the first five weeks of 2009, K&L Investments received three additional distributions through WGTI totaling $27,000,000.  Even though the account for these securities is held in the name of K&L Investments, K&L Investments has not had a bank account.  All of the contributions to OCP in 2006 and 2007 totaling $180 million and distributions from OCP in 2008 and 2009 totaling $167,900,000 were sent and received directly by WGTI.

K&L Investments continues to hold securities in OCP with a value of approximately $23.0 million. All of the funds and assets for the benefit of SAM, K&L Investments and WGTI are frozen.  The fund manager has been cooperative with the Receiver in ensuring that the estate assets remain frozen.

In addition to the K&L Investments' account, there is an account in the name of WGTI with a value of approximately $3.9 million.   Relief Defendant Janet (Walsh) Schaberg also has an account that remains frozen in OCP with a value of approximately $2.5 million.

**Delaware Land Associates LLC**

Mr. Walsh and Mr. Greenwood, through an entity called, Walsh Greenwood & Co., have a 75% equity position in real estate holdings as a limited partner in Delaware Land Associates LLC. The Receiver met with and interviewed the principal and general manager of Delaware Land Associates.

Mr. Walsh and Mr. Greenwood provided the initial capital investment to acquire rights to a parcel of property and fund the soft costs to properly entitle the property. The general manager provided the day-to-day management and was responsible for all of the entitlement process. There are two active real estate projects that the Receiver is analyzing.

Sweetwater Point LLC is a 49-acre development near Hillsborough, DE. Walsh Greenwood & Co. invested $3.0 million for a 50% equity position in this project. Through the noncash capital contributions from WGTI, Sweetwater Point LLC is currently being carried on WGI's books as an investment at the cost of $3.0 million. Lehman Brothers also invested $3.0 million for the other 50% equity position. Lehman loaned an additional $6.0 million in return for a first deed of trust which money was to be used for development costs. This project was fully entitled before the real estate market collapsed. Currently, a sale is pending with the Delaware Department of Transportation. The Delaware Department of Transportation wants to run a roadway through the middle of the property that would render it useless as a residential subdivision. The sale would result in a return of most, if not all of the monies invested.

A second real estate project called Liberty Hill LLC was designed as a 166-lot development in Maryland. Mr. Walsh and Mr. Greenwood invested approximately $2.9 million to acquire this property. Entitlements were completed for the first phase of 115 home sites. No rough grading or other site work has commenced.

Investment in Liberty Hill LLC is being carried on the books of WGTI as investments in Delaware Land Associates and Liberty Hill at the cost of approximately $2.9 million and $484,000, respectively, which totaled approximately $3.4 million.

Several years ago, a large national builder was negotiating to purchase the project. When the real estate market began experiencing difficulty, the builder walked away from the project just as they were starting to sell lots. Thereafter, the builder demanded return of its deposit under the purchase agreement and to be reimbursed for its soft costs. Delaware Land Associates refused the demand and the builder filed suit. The Receiver has asked the court in Maryland to stay the action during the pendency of this case. The Receiver will carefully analyze the merits of the case, weighing the potential liability and costs of litigation compared to the potential equity in the asset and thereafter, make a

recommendation to this Court.  Currently, the Receiver is unable to make an assessment as to the potential value of this asset.

## Upspring Software Inc. ("Upspring")

According to the business records, WGTI carried an equity investment at the cost of $484,575.85 in a software vending company, Upspring.  Records indicate that Upspring was acquired by MKS Inc., on or about March 26, 2001.  WGTI has received a number of dividend payments from MKS Inc.  The Receiver served a copy of the Order on MKS Inc. and demanded that the assets be frozen and not otherwise distributed to the Defendants. The Receiver made a written request for documents and information on this asset, but has not yet received a response from MKS Inc.  The Receiver is unable to estimate a value of this asset at this time.

## Assets held in the Name of Robin Greenwood (Relief Defendant)

The primary assets held in the name of Ms. Greenwood are the two residential properties at 20 & 22 Wheeler Road, North Salem, NY and her ownership of Grand Central Inc., which is the titled owner of a hunter pony farm in Brewster, NY situated on approximately 286.2 acres.  The Receiver has conducted a site visit of each of these three properties and has engaged two local firms to appraise each of the properties.

The Receiver is working with counsel to pay certain invoices that, in the opinion of the Receiver, preserve the value of the residential assets.   Ms. Greenwood's counsel indicated to the Receiver that it was their intention to turn over to the receiver monthly rental payments collected from the family friend occupying one of the homes.

Ms. Greenwood also turned over to the Receiver a check in the amount of $33,000 payable to her which represented the return of a deposit for a summer rental.

## Grand Central Inc.

Pursuant to a letter submitted to the Court by counsel for Ms. Greenwood outlining an agreement that was reached between Ms. Greenwood, the SEC, CFTC and Receiver, the Receiver took control of the farm's operating account and has been paying the employees and operational expenses of the farm.

To prepare for the sale of the ponies, the Receiver retained the services of two appraisers of hunter ponies to provide a reasonable basis for the Receiver to determine the fair market value of the ponies.  Ms. Greenwood and the Receiver have been contacted by a number of people interested in bidding on the ponies.  The Receiver has begun the process of approving the sale of the ponies and intends to close down the farming operations as soon as possible.  Some limited staff will need to be maintained to provide upkeep and security for the property.

The appraisers engaged by the Receiver stated that eleven ponies had no value and should be given away. There are 92 ponies owned by Grand Central Inc. with a market value of $988,350.00. Ms. Greenwood has expressed her belief that a number of the ponies are her separate property. Without waiving her right to advance a claim to the proceeds of the sale of certain unidentified ponies, Ms. Greenwood recently identified 20 ponies she claims as her separate property and expressed her desire to remove the 20 ponies from the farm so the Receiver can close down the farming operations. Ms. Greenwood's plan would relocate the 20 ponies to as many as eleven different farms in five states.

The appraised value of the 20 ponies identified by Ms. Greenwood is $477,250.00 or 48% of the total value of the ponies. The Receiver has been required to fund expenses for the operations of the farm by making a loan to Grand Central from the general receivership estate fund. It seems disingenuous for Ms. Greenwood to first plead with the Court and parties to care for the ponies and then assert a claim that removes almost half of the entire value of the ponies. There are other substantive reasons as to why the Receiver contests Ms. Greenwood's claim to any of the ponies and has not agreed to the relocation of any of the ponies unless they are sold for fair market value, not the least of which is the fact that WGTI paid over $18.6 million to maintain the farm and ponies over the last seven years. If an agreement cannot be reached between the Receiver and counsel for Ms. Greenwood, the Receiver intends to file a motion seeking further instructions from the Court regarding the conflicting claims for these assets.

Ms. Greenwood has expressed an interest in selling the farm with the assistance of the Receiver. To that end, the Receiver has made arrangements to get two appraisals of the farm.

Another potential source of recovery to the Receivership Estate is the sale of the equipment. The original cost of the equipment at the farm was approximately $2.1 million. The Receiver anticipates that some of the equipment will be sold with the ponies and the heavier farm equipment would be sold at auction or priced and transferred with the sale of the farm.

Ms. Greenwood turned over accounting detail maintained by Grand Central Inc (Tab 37). The accounting detail shows a total of about $27.6 million in capital expenditures and approximately $7 million in operating losses.

The schedule under Tab 17 shows that WGTI paid Grand Central about $18.6 million from 2002 through February 2009. The Receiver has traced additional funds paid through Mr. Greenwood's personal bank account to Grand Central and is continuing to reconcile the accounting provided by Ms. Greenwood.

### Assets held in the Name of Janet (Walsh) Schaberg (Relief Defendant)

#### Receipts from WGTI

Under Tab 38 is the summary of payments by year from WGTI to Janet (Walsh) Schaberg totaling about $19.8 million.

Ms. Schaberg has disregarded this Court's Order and has refused to provide any financial information to the Receiver.

#### Note Receivable due from Andrew Walsh

A document located at WG Trading offices shows a 2007 draft promissory note of $175,000 from Janet Walsh to Andrew Walsh. The terms of this note are identical to the draft promissory note between Andrew Walsh and his father, Stephen Walsh. The Receiver has not verified if this loan was actually made.

### Third Party Claims

On February 18, 2009 James Carder, the 49% shareholder of Westridge Capital Management, Inc. transferred $4,000,000 from the company's bank account to his personal account. The Receiver believed this was a transfer well outside of the normal course of business and demanded return of these funds. On April 29, 2009 Mr. Carder repaid $4,000,000 to the Receivership Estate.

The Receiver learned that Westridge and WGTC purchased professional liability insurance and Fidelity Bonds. A review of the company records and files revealed the following coverage:

| | |
|---|---|
| Westridge | Investment Advisor Professional and Management Liability; $5.0 million primary coverage and $5.0 million excess coverage; Deductible $150,000 for each loss. |
| | Financial Institution Bond; $5.0 million coverage; Deductible $1.0 million for each loss. |
| WGTC | Fiduciary Dishonesty Bond; $2.2 Million total aggregate liability; Lesser of $500,000 or 10% of each insured plan's property; coverage only for employee benefit plans subject to ERISA; |

The Receiver provided notice of actual and potential claims to each insurer.

The financial activities presented and discussed above detail that WGTC and WGTI earned income of about $629 million during the period from January 1, 1999 through

February 25, 2009. During the same period the WG entities allocated income of about $920 million to investors with either open or closed equities or positions and funded withdrawals in excess of $5.0 billion. The Receiver believes some of the withdrawals included income that was falsely calculated and allocated, which could create a Fraudulent Transfer. While this belief is preliminary and subject to further study and analysis, there are statute of limitation dates that should be addressed now if the Receiver's preliminary observations are determined to be valid in the future. Accordingly, the Receiver has demanded the return of falsely calculated income distributed to certain investors.

The Receiver is analyzing potential claims against other third parties and will conduct a cost benefit analysis of pursuing any other claims that may exist.

**Investor Claims Issues**

The Receiver has had conversations and meetings with many of the investors and/or the investors' attorneys. In addition, some of the investors have written to the Receiver expressing a variety of views on priority of claims. The Receiver intends to file a motion with this Court by June 30, 2009 with a proposed claims verification procedure. Thereafter, the issue of a distribution procedure can be addressed.

Respectfully Submitted,

/s/

Robb Evans & Associates LLC
Receiver