# EXHIBIT A

1

07SYGREP

```
 1    UNITED STATES DISTRICT COURT
 1    SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------------------------------------x
 3
 3    UNITED STATES OF AMERICA,
 4
 4              v.                        09 Cr. 722 (MGC)
 5
 6    PAUL GREENWOOD,
 6
 7                    Defendant.
 7
 8    ------------------------------x
 8                                        July  28, 2010
 9                                        10:45 a.m.
 9
10    Before:
10
11            HON. MIRIAM GOLDMAN CEDARBAUM,
11
12                                        District Judge
12
13
13
14                        APPEARANCES
14
15
15    PREET BHARARA,
16        United States Attorney for the
16        Southern District of New York
17    JOHN O'DONNELL
17    MARISSA MOLE,
18        Assistant United States Attorneys
18
19
19    FREDERICK HAFETZ, ESQ.,
20    TRACY SIVITZ, ESQ.,
20        Attorneys for Defendant
21
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1    BY THE COURT:
 2    Q.  Mr. Greenwood, I understand that you would like to enter a
 3    plea of guilty to the charges against you.
 4    A.  That's correct.
 5    Q.  Before I can enter your plea, I have to satisfy myself that
 6    you understand exactly the consequences of entering a plea of
 7    guilty and that you are entering this plea of your own free
 8    will and that you understand everything concerning the plea,
 9    all of its consequences so for those purposes, I would like to
10    ask you some questions.
11              First of all, where were you born?
12    A.  Los Angeles, California.
13    Q.  And how much education have you had?
14    A.  I have a Bachelor's degree in psychology and MBA and
15    doctorate in economics.
16    Q.  So there is no question that you have a clear knowledge of
17    the English language?
18    A.  Yes.
19    Q.  That you are highly literate in English, but nevertheless
20    if I say something that you don't understand or ask you
21    something that is not clear to you, please tell me and I will
22    explain it further.
23              Within the last 24 hours, have you taken any substance
24    or drugs that might affect the clarity of your mind?
25    A.  No.
```

```
 1    Q.  Nothing at all, not even an aspirin?
 2    A.  Nothing.
 3    Q.  And within the last 48 hours, have you had any alcoholic
 4    beverages?
 5    A.  Yes.
 6    Q.  What and when?
 7    A.  A Margarita last night.
 8    Q.  All right.  And what is contained in a Margarita?
 9    A.  Tequila and I'm not sure what else.  Some sort of a juice,
10    lime juice, I think.
11    Q.  I see.
12            Is your mind clear this morning?
13    A.  Yes.
14    Q.  The effects of the Margaretta, whatever it is, I take it,
15    has worn off entirely?
16    A.  Completely.
17    Q.  Very well.
18            Have you carefully discussed the charges against you
19    with your lawyer?
20    A.  Yes, I have.
21    Q.  And have you discussed with him the consequences of this
22    plea?
23    A.  Yes, I have.
24    Q.  Nevertheless, I would like to review that with you because
25    I want to be sure that you really know what you are doing and
```

4

```
 1   most important what you are giving up.
 2            Let me turn first to what you are giving up when you
 3   enter a plea of guilty because under our law you have an
 4   absolute right to continue to plead not guilty and to put the
 5   government to its proof beyond a reasonable doubt of each of
 6   the charges against you.
 7            You have the right at a trial at which you put the
 8   government to its proof to a judgment by a jury of twelve
 9   persons, and at that trial you have the right to question the
10   witnesses against you and at that same trial you have the right
11   not to yourself testify in any respect, because nobody can
12   compel you to incriminate yourself, and your silence may not be
13   used against you in any way at a trial.
14            Do you understand all of that?
15   A.  Yes, I do.
16   Q.  But if I enter your plea of guilty, it is as if that jury
17   of twelve persons brought in a verdict of guilty after a full
18   trial at which the government proved your guilt beyond a
19   reasonable doubt.  If I enter your plea of guilty there will be
20   no further trial of any kind, you will stand convicted as if
21   that jury had brought in a verdict against you.
22            Do you understand that?
23   A.  I understand.
24   Q.  At a trial you would have the power of the court to
25   subpoena witnesses in your behalf.  You are giving all of that
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1   up if I enter your plea of guilty.
 2   A.  I understand.
 3   Q.  Now I would like to review with you the charges against you
 4   to which you wish to enter a plea of guilty.
 5             There are six counts against you.
 6             Count 1 charges you with conspiracy to commit
 7   securities fraud and wire fraud.  That is a charge of violating
 8   the general conspiracy statute of the criminal law, Section 371
 9   of Title 18, and if I enter your plea of guilty to that charge
10   you are subject to a sentence of up to five years in prison to
11   be followed by a term of supervised release of up to three
12   years.  In addition, you are subject to a fine.
13             THE COURT:  Now, which is it?  This is just
14   boilerplate.  It doesn't tell the defendant whether you are
15   talking about twice the pecuniary loss or twice the pecuniary
16   gain and what that is.  The formulaic statements are menseless.
17   I have it all the time in plea agreements and I don't
18   understand why.
19             MR. O'DONNELL:  It is the greatest of those three
20   categories here, your Honor.
21             THE COURT:  Which is?
22             MR. O'DONNELL:  In this case conservatively the
23   greatest of the three categories would be twice the loss to the
24   investors, which is approximately, according to the receiver's
25   calculations, approximately at least eight or nine hundred
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

```
 1   million dollars.
 2   BY THE COURT:
 3   Q.  You are subject to a fine of twice that if I enter your
 4   plea of guilty to Count 1 of the indictment.
 5            Do you understand that?
 6   A.  Yes, I do.
 7   Q.  I should also tell you, because this will apply to all of
 8   the supervised release provisions, that if you should violate
 9   the -- if you are sentenced to prison and to supervised release
10   following your release from prison, if you should violate any
11   of the conditions of supervised release you are subject to an
12   additional term of imprisonment of the length of supervised
13   release without regard to the initial sentence of imprisonment.
14            Do you understand that?
15   A.  Yes, I do.
16   Q.  Very well.
17            And that applies to every part of a sentence of
18   supervised release, that is, the supervised release on any or
19   all of the counts against you.
20            Count 2 of the indictment charges you with securities
21   fraud.  And I see you are being charged with both securities
22   fraud and aiding and abetting securities fraud.
23            If I enter your plea of guilty to that charge you are
24   subject to a term of imprisonment of up to 20 years, and if you
25   are sentenced to a term of imprisonment you are subject to a
```

7

```
 1   term of up to three years of supervised release following your
 2   release from prison.  In addition, you are subject to a fine of
 3   up to $5 million.  And on each of these counts you are subject
 4   to a special assessment of $100, which although it is not a
 5   fine, it is collectible as if it were a fine.
 6           Do you understand all of that?
 7   A.  Yes, I do.
 8   Q.  Count 3 of the indictment charges you with commodities
 9   fraud, that is, it charges you with engaging in transactions
10   and practices and courses of business which operated as a fraud
11   upon clients and participants of a commodities pool that you
12   operated from at least 1996 through February of 2009.
13           If I enter your plea of guilty to that charge, you are
14   subject to a sentence of up to ten years in prison to be
15   followed by a term of up to three years of supervised release
16   upon your release from prison?
17           THE COURT:  And which is the fine here?
18           MR. O'DONNELL:  Again, your Honor, I think for
19   purposes of the plea allocution the fine should be the highest
20   number, which would be twice the gross loss of all of the
21   investors.
22           THE COURT:  Very well.
23   BY THE COURT:
24   Q.  You are subject to a fine on this charge of twice the gross
25   pecuniary loss to all of those who participated in this
```

```
 1   commodities pool that you operated.
 2             Do you understand that?
 3   A.  Yes, I do.
 4   Q.  Very well.
 5             Now, each of Counts 4 and 5 charge you with wire fraud
 6   in violation of the Criminal Code of the United States, Section
 7   1343 and, again, you are charged with aiding and abetting as
 8   well.
 9             If I enter your plea to those charges, Counts 4 and 5,
10   on each of them you are subject to a sentence of up to 20 years
11   in prison and upon your release to a term of up to three years
12   of supervised release and in addition you are subject to a
13   fine.
14             THE COURT:  And what is the fine here?
15             MR. O'DONNELL:  Again, your Honor, I think the same
16   analysis would be appropriate.
17             THE COURT:  I can't tell from looking.  Which is the
18   biggest number?
19             MR. O'DONNELL:  The biggest number would be the loss
20   to the investor that the receiver preliminarily calculated to
21   the eight to nine hundred million dollar range, so the
22   potentially greatest fine could be twice that number.
23             THE COURT:  Very well.
24   BY THE COURT:
25   Q.  Do you understand that that fine of up to twice the gross
```

```
 1  pecuniary loss to your investors is the fine on each of those
 2  charges?
 3  A.  Yes, I do.
 4  Q.  That is, Counts 4 and 5 of the indictment.
 5          And Count 6 of the indictment charges you with money
 6  laundering in violation of the Criminal Code of the United
 7  States from about 1996 through about February of 2009, and that
 8  you engaged -- it is charged that you engaged in a monetary
 9  transaction in criminally derived property that was more than
10  $10,000 in value and was derived from the unlawful activity to
11  which you are pleading in the other counts.
12          You understand that?
13  A.  Yes, I do.
14  Q.  If I enter your plea of guilty to Count 6, you are subject
15  to a sentence of imprisonment of up to ten years, and if you
16  are sentenced to a term of imprisonment upon your release from
17  prison you are subject to a term of up to three years of
18  supervised release, and, again, you are subject to a fine.
19          THE COURT:  Now, which is it here?
20          MR. O'DONNELL:  Again, your Honor, the same analysis
21  would apply.  It should be --
22          THE COURT:  Right, but which is the largest?
23          MR. O'DONNELL:  The largest would be twice the gross
24  pecuniary loss to the investors which is approximately twice
25  eight or nine hundred million dollar.
```

```
 1              THE COURT:  Very well.
 2    BY THE COURT:
 3    Q.  Do you understand that?
 4    A.  Yes, I do.
 5    Q.  Now, this is a cooperation agreement and I am less
 6    interested in your agreement to cooperate than in making sure
 7    you understand what you are facing.
 8              I see you also have admitted to the forfeiture
 9    allegation in the indictment.
10    A.  That's correct.
11    Q.  Is that correct?
12    A.  Yes.
13              MR. HAFETZ:  Your Honor, I'm sorry.
14              With regard to the statement of the amount of fine
15    that Mr. O'Donnell has put on the record, my understanding is
16    that potentially the amount that it could be --
17              THE COURT:  It is up to that amount, that is the
18    maximum, that is correct, but it is the maximum that I want to
19    be sure Mr. Greenwood understand, that he is subject to that in
20    the event that the numbers warrant it.
21              MR. HAFETZ:  Right, if the numbers warrant it, right,
22    correct, yes.
23              THE COURT:  It's not -- well, you can see in this
24    agreement that we have boilerplate recitation from the statute.
25              MR. HAFETZ:  Yes.
```

```
 1              THE COURT:  But I want to be sure that Mr. Greenwood
 2   has some conception of what it means and what we are talking
 3   about.
 4              MR. HAFETZ:  Yes.
 5              THE COURT:  I am not a lover of boilerplate when
 6   people's liberty is very clearly very much at stake.
 7              MR. HAFETZ:  Yes.
 8   BY THE COURT:
 9   Q.  Have you familiarized yourself with the forfeiture
10   allegation in the indictment?
11   A.  Yes, I have.
12   Q.  And do you understand how much you are likely to forfeit
13   here?
14   A.  Yes, I do.
15   Q.  Now, you also have received the agreement of the government
16   to give you credit for the value of any assets that you
17   disgorged in the enforcement proceeding, that is, that you
18   turned over to the receiver or the Securities and Exchange
19   Commission or the Commodities Futures Trading Commission.
20              Do you understand that?
21   A.  Yes, I do.
22   Q.  That is actually a concession to you.
23              THE COURT:  Now, much of this later boilerplate I
24   don't see the relevance of it at all.
25              I am not governed by the sentencing guidelines.  I
```

```
 1   don't understand what difference it makes that the conduct
 2   constitutes relevant conduct under the sentencing guidelines.
 3   Why is this all boilerplate here?
 4           I keep urging the government to drop the formulas
 5   which have no meaning to the defendant and really don't have
 6   much meaning to the judge anymore.
 7           MR. O'DONNELL:  Your Honor, it is part of the
 8   defendant's proffer before his plea.  He acknowledged that
 9   certain of the conduct predated the times alleged in the
10   indictment and we put it in the agreement simply to reflect the
11   defendant was accepting responsible for that conduct, so that's
12   really why it is in our agreement with the defendant.
13           THE COURT:  Yes.  But what is the relevance of his
14   agreeing that it is relevant conduct pursuant to the United
15   States sentencing guidelines?
16           MR. O'DONNELL:  Your Honor, I think it just
17   demonstrates he is accepting responsibilities for --
18           THE COURT:  Well, I think it is because you are so
19   accustomed to including a lot of formulaic verbiage is the only
20   way I can put it which has no bearing on sentence, especially
21   now that the guidelines no longer apply.  You are still
22   repeating language that was written at a time when they did
23   apply.
24           MR. O'DONNELL:  Yes, your Honor.
25           THE COURT:  Why is that?
```

```
 1          MR. O'DONNELL:  Well, we think it is important that
 2   the defendant accept responsibility for that conduct and --
 3          THE COURT:  Why don't you have him agree that he
 4   accepts responsible instead of that the conduct set forth in
 5   subsection 2 constitues relevant conduct, relevant conduct
 6   pursuant to the sentencing guidelines.
 7          You know, I keep urging the government that putting in
 8   formulaic words that have no real meaning -- if what you wanted
 9   him to take responsible for something, you should say so.
10   That's not what this says.
11          I keep trying to send that message back.
12          MR. O'DONNELL:  I think basically --
13          THE COURT:  That the plea agreement should not be a
14   form that covers any possible plea, it's only this plea that
15   I'm taking at the moment.
16          MR. O'DONNELL:  Very well, your Honor.  This is
17   designed so that that conduct can be considered by the court in
18   fashioning a sentence.
19          THE COURT:  And otherwise it could not, is that what
20   you're saying?
21          MR. O'DONNELL:  I think --
22          THE COURT:  That is, I don't want to -- this is too
23   important an act for Mr. Greenwood for me to get sidetracked,
24   but I really wish the government would leave some of this form,
25   would mar some of its form, let me put it that way, would not
```

14

```
 1    just copy forms mindlessly.
 2              MR. O'DONNELL:  Okay, your Honor.
 3              THE COURT:  Because they have much less impact and
 4    they really have no meaning.
 5              I'm interested in what the defendant is giving up and
 6    he is interested in what he is facing and the other legal
 7    issues are a different matter and a lot of this language
 8    doesn't apply to him.
 9              I'm trying to look through and find out what does and
10    make sure that he understands that.
11    BY THE COURT:
12    Q.  There is no question, Mr. Greenwood, and I see it has been
13    told to you many times, that the government cannot set your
14    sentence, that only I have the responsible for setting your
15    sentence, and I will determine your sentence without any
16    participation by the government in my decision.
17    A.  I understand.
18    Q.  But you have other cooperation arrangements that you have
19    agreed to with the government that really don't bear on my
20    sentence.
21              I am looking to make sure that you understand what it
22    is that your giving up, and I see that you are giving up a very
23    important right, which is the right of appeal in your
24    agreement.
25              For example, you have in here --
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

```
 1              THE COURT:  We know that Mr. Greenwood is a citizen.
 2     You have in here a whole paragraph on what would happen if he
 3     were not, but he is.  So why is that paragraph here?
 4              MR. O'DONNELL:  Your Honor, in light of the recent
 5     Supreme Court decisions on ineffective assistance involving the
 6     immigration consequences we put that in all our agreements.
 7              THE COURT:  Even on people that can't possibly be
 8     deported.
 9              MR. O'DONNELL:  Yes, your Honor.
10              THE COURT:  Well, does that make sense, Mr. O'Donnell?
11     You are much too intelligent to think that makes sense.
12              MR. O'DONNELL:  Obviously, your Honor, in this case it
13     doesn't apply.
14              THE COURT:  It has no application at all.  Why would
15     you put in surplus irrelevant verbiage when a plea agreement is
16     a serious agreement between two parties and this does not apply
17     to either party.
18              MR. O'DONNELL:  That's a fair point, your Honor.
19              THE COURT:  You are telling me that you have formed,
20     that you are afraid to change a word, even if they clearly have
21     no relevance.  When I say you, I'm not talking about you
22     individually.
23              MR. O'DONNELL:  I understand that.  I am not taking
24     this personally.
25              THE COURT:  I am sending back to your office a message
```

```
 1    that you should never leave a form up marred.  The fact that
 2    there is a case that applies to a different circumstance is not
 3    a reason for including it in this plea agreement.
 4              MR. O'DONNELL:  That's a fair point, your Honor.
 5              THE COURT:  It makes no sense and it is a distraction
 6    from what does matter here.
 7    BY THE COURT:
 8    Q.  In any event, you have a very important right of appeal
 9    from my sentence and which in this agreement you have given up.
10              Did you discuss that carefully with your lawyer before
11    you agreed to it?
12    A.  Yes, yes, I did.
13    Q.  And do you understand the importance of what you are giving
14    up?
15    A.  Yes, I do.
16    Q.  And are you giving that up of your own free will?
17    A.  Yes, I am.
18    Q.  With a full understanding of what you are giving up?
19    A.  Yes.  Yes.
20    Q.  Very well.
21              Now, it is also accurate that once you enter this
22    plea, you will not be able to withdraw it, so this is the time
23    to be sure that you want to plead to everything that you are
24    pleading to because you will not be able to change your mind.
25    A.  I understand.
```

```
 1  Q.  That is, you will not be able to raise any reason why what
 2  will result in a judgment of conviction can be attacked legally
 3  either by appeal or any other method, by collateral attack of
 4  some kind.  You are giving up all of those rights in this
 5  agreement, and I hope you discussed that carefully with your
 6  lawyer.
 7  A.  I did.
 8  Q.  And you understand what you are giving up?
 9  A.  I do.
10  Q.  Very well.
11          THE COURT:  Why does he need to recognize what would
12  happen if he is not a citizen of the United States?
13          Well, I have made my point, Mr. O'Donnell.  You really
14  should carry that back.
15          MR. O'DONNELL:  Yes, your Honor, I will.
16          THE COURT:  It demeans the office.
17          Now, I seem to have a copy of this plea agreement that
18  is only signed by one side.
19          MR. O'DONNELL:  Your Honor, I have the original which
20  Mr. Greenwood --
21          THE COURT:  Thank you.  I would like to see it.
22          MR. O'DONNELL:  May I hand it up to your court deputy,
23  your Honor?
24          THE COURT:  Please.
25          (Handing to the court)
```

18

```
 1              (Pause)
 2              MR. HAFETZ:  Your Honor, may I just clarify one thing.
 3              With respect to the giving up the right of appeal, I
 4  believe the language in the cooperation agreement with respect
 5  to that, which is on page 6, is in the paragraph that
 6  relates -- it is on the bottom of page 6, I think that's what
 7  your Honor is referring to.  That is in a paragraph that
 8  relates --
 9              THE COURT:  Well, there are two references here to
10  appeal.
11              MR. HAFETZ:  Yes.
12              THE COURT:  One is the full paragraph two, that is the
13  second full paragraph, gives up any right to attack the
14  conviction on appeal.
15              The one down below has to do with someone who is not a
16  citizen of the United States, which is not this defendant.
17              MR. HAFETZ:  That's correct.  But Mr. Greenwood, as I
18  understand it from the plea agreement, I don't think the
19  government disagrees with him, does not give up the right to
20  appeal the sentence should he decide to appeal the sentence.
21  He is giving up the right to attack the guilty plea and his
22  conviction and he is giving up the right --
23              THE COURT:  Well, the conviction, the sentence is the
24  conviction.  The plea of guilty, if I accept it and enter it
25  today, is a conviction.  It becomes a final conviction when
```

```
 1    sentence is pronounced.  But I read this as giving up the right
 2    of appeal.
 3            MR. HAFETZ:  I don't think so, your Honor.  I think
 4    what he is giving up is the right to attack -- your Honor is
 5    correct that ultimately --
 6            THE COURT:  It says not only to withdraw the plea, but
 7    to attack his conviction, and I understand that as meaning
 8    either directly or collaterally that he is giving up the right
 9    to appeal his sentence.
10            Now, if that's not what it means, we should be clear
11    on that.
12            MR. O'DONNELL:  Your Honor, I think the waiver is
13    limited to the grounds that are articulated in the paragraph,
14    which is that the defendant can't appeal on the grounds that
15    the government failed to produce discover, Jencks Act material
16    or exculpatory material other than material that would
17    establish the defendant's factual innocence.
18            THE COURT:  All right.  Then I take it you do not
19    think that this is an agreement not to appeal the sentence?
20            MR. O'DONNELL:  I agree with defense counsel's
21    position.  It's a limited waiver on --
22            THE COURT:  That's fine, as long as the defendant
23    understands what he is agreeing to and what he is giving up.
24            MR. HAFETZ:  Correct.
25            THE COURT:  I have no interest in changing the
```

```
 1   agreement.
 2              I see.  Well, that is a change in your form.
 3              All right.  That is, you are both agreeing that this
 4   does not mean that Mr. Greenwood is giving up his right to
 5   argue to the Court of Appeals that my sentence is not
 6   reasonable?
 7              MR. O'DONNELL:  I think that's right.
 8              MR. HAFETZ:  That's correct.
 9              THE COURT:  You are the ones who have agreed so you
10   should know what you agreed to, but I just want the defendant
11   to be clear as to what he is agreeing to.
12   BY THE COURT:
13   Q.  Now I am going to ask you several things:
14              I am going to ask you, number one, apart from this
15   agreement, has anybody promised you anything in connection with
16   this plea?
17   A.  No.
18   Q.  Has anybody threatened you in connection with this plea?
19   A.  No.
20   Q.  Why do you want to plead guilty?
21   A.  Because I am guilty.
22   Q.  Do you have any doubt of that?
23   A.  No.
24   Q.  Very well.
25              Then I am going to ask Mr. Daniels to place you under
```

```
 1   oath.
 2   PAUL GREENWOOD,
 3              the defendant, having first been duly sworn, was
 4                    examined and testified as follows:
 5   BY THE COURT:
 6   Q.  Now I would like you to tell me in your own words exactly
 7   what you did that you are pleading guilty to.
 8              See if you can really make it your own words rather
 9   than reading it from a paper.
10              Did you enter in an agreement with other people?
11   That's what a conspiracy is.
12   A.  Yes.  My partners, Steve Walsh and I, basically told
13   investors that we were investing the money in a strategy called
14   equity index arbitrage.
15   Q.  I see.  This was what you called the strategy of your
16   companies?
17   A.  Yes.
18   Q.  And what companies were those?
19   A.  The company that was the commodity pool and broker-dealer
20   was WG Trading.
21   Q.  What was the other?
22   A.  The other company, WG Investors, was a Peter fund into WG
23   Trading.
24   Q.  And you and your partner were the --
25   A.  Commodity pool operators --
```

```
 1   Q.  Were these corporations?
 2   A.  No, they were partnerships.
 3   Q.  They were actually partners ships?
 4   A.  Yes.
 5   Q.  And you and your partner agreed to what?
 6   A.  To present it so we were investing all of the funds into
 7   the index arbitrage strategy and, in fact, we didn't.
 8   Q.  What was the index arbitrage strategy?
 9   A.  The strategy is the equivalent of a cash management
10   strategy.  We would buy stocks in, for example, the S&P 500 and
11   we would sell futures against them and once the trade is on the
12   profits would be locked in, we would receive the dividends on
13   any of the stocks that paid dividends and we would pay the
14   costs of carrying the positions, but the net of all of that
15   would be a small profit, and then you do that on a leveraged
16   basis.
17   Q.  And what do you mean by that?
18   A.  Because there were stocks involved and because we were a
19   broker-dealer, we could theoretically leverage 20 to one.  As a
20   practical matter, we rarely leveraged more than ten to one,
21   meaning for every dollar we would invest, we would have $10 in
22   a position.
23   Q.  And, in fact, what did you do with the money that you
24   received on those representations?
25   A.  With, with, with a large percentage of the money we did
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1    exactly that.  With another part of the money we invested in
 2    other investments that the investors were not aware of and
 3    misled the investors.
 4    Q.  That is, you issued statements that were not accurate?
 5    A.  That's correct.  Mostly what we did is, there were notes
 6    that were issued to certain investors and the interest rate on
 7    those notes was the same return as we made with the money that
 8    was invested in the arbitrage strategy and the return was
 9    manufactured.
10    Q.  There was no return?
11    A.  The interest rate was manufactured based on whatever the
12    return was based on the strategy.
13    Q.  I see.
14    A.  And then we used that money -- I don't know how much detail
15    you want me to go into --
16    Q.  I would like to understand exactly what you were doing.
17    A.  Okay.
18             We were trying -- we had an investment in a company
19    called Signal Apparel which had done very bad and we ended up
20    losing a lot of money and the attempt was to make back the
21    money that we lost in the Signal Apparel investment.
22    Q.  How did you try to do that?
23    A.  By making other investments that had higher returns than
24    the index arbitrage would give and so we would give the
25    investors the return on the index arbitrage and hopefully we
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1    would make more money on the investment.
 2    Q.  I understand, but what is it that you cheated the investors
 3    in?  When you say you made return, what is it that you didn't
 4    make return on?
 5    A.  On all the money that was lost in the other investments, in
 6    the initial investments in Signal Apparel, in other investments
 7    that were made and didn't produce the returns that we expected
 8    them to produce and in money that we took out personally for
 9    basically our own use.
10    Q.  That is, you treated these partnerships as your own
11    personal bank account?
12    A.  Correct.
13    Q.  And you drew as you wished?
14    A.  Correct.
15    Q.  What is it that you reported to your investors?
16    A.  Well, we treated the money that we took out as a loan so we
17    would --
18    Q.  On your own books, you mean?
19    A.  On the books of -- yes, yes.  So we would report to the
20    investors the same rate of return that we earned on the WG
21    Trading index arbitrage trading.
22    Q.  And that was simply flatly untrue?
23    A.  Correct.
24    Q.  That is, you did not make that money that you reported to
25    investors that you made?
```

```
 1   A.  That's correct.
 2   Q.  And none of your investors asked for the money?
 3   A.  When they asked for the money we would give them money back
 4   so in some sense --
 5   Q.  So this was a Ponzi scheme, as it is loosely called?
 6   A.  Well, sort of, because we actually had --
 7   Q.  You were using other monies to make up for what you
 8   couldn't give?
 9   A.  That's correct.
10   Q.  But, of course, you never could make it up entirely?
11   A.  Well, initially we thought we could and as time went on the
12   hole got bigger and bigger and at a point we couldn't.
13   Q.  Well, if you were taking money out for yourselves, you
14   could never make it up, right, unless you made huge profits?
15   A.  That's correct.
16   Q.  And you knew that from the beginning, that if you were
17   taking it for personal use?
18           MR. HAFETZ:  May I have one minute, your Honor.
19           THE COURT:  Sure.
20           (Pause)
21   A.  Early on after the partnership was established and the
22   investors had given us the money, it became apparent we
23   couldn't give back the money we were taking out.
24   Q.  So you knew it for a long time?
25   A.  We did know it for a long time and we continued to do it.
```

```
 1    Q.  And you continued to take money out for your own use?
 2    A.  Yes, we did.
 3    Q.  And how much money were you taking out?
 4              MR. HAFETZ:  Does your Honor mean over the entire
 5    period?
 6    BY THE COURT:
 7    Q.  As you were going along, what were you doing every year,
 8    starting when?  In the beginning, you said.
 9    A.  In excess of $75 million.
10    Q.  You mean in total?
11    A.  Yes.
12    Q.  And roughly how much did you take out annually?
13    A.  It, it, it varied.
14    Q.  What determined that?
15    A.  What investments we wanted to make outside.  We have a
16    house, we have antiques, we have a horse farm.
17    Q.  What things you wanted to buy for yourself?
18    A.  That's correct.  And all of that has been turned over to
19    the receiver.  They auctioned for all the antiques and the
20    collectibles scheduled for the latter part of this year and the
21    horse farm is on the market.
22    Q.  But all of that was stolen money, correct?
23    A.  That's correct.
24    Q.  And you did this for how many years?  During what period of
25    time?
```

```
 1   A.  Before 1996 through 2009.
 2           Some of the wire transfers that we sent for the money
 3   were in Manhattan, some were outside of Manhattan, some were
 4   outside of New York.
 5   Q.  And where were your investors?  How did you get them?
 6   A.  The investors were all large institutions.  They were
 7   either the pension funds or investment funds of the
 8   institutions and we got the money from them and they were all
 9   over the country, including, including Manhattan.  Yeah,
10   including Manhattan.
11   Q.  Manhattan and Westchester presumably, or did you have
12   nobody in Westchester?
13   A.  I would have to go back.  I don't think there was anybody
14   in Westchester.
15   Q.  Didn't your partner have an office in -- maybe it was
16   farther north than Westchester?
17   A.  No, I live in North Salem.
18   Q.  You are the one who had an office in, in --
19   A.  No, no.  We had offices in Greenwich and Long Island and
20   Jersey City.
21   Q.  I see.  And both of you worked in those offices?
22   A.  I worked in Connecticut and Steve Walsh worked in Long
23   Island.
24   Q.  Do you have any doubt that what you were doing was a crime?
25   A.  No.
```

```
 1   Q.  All right.
 2            THE COURT:  Is there anything else that you would like
 3   me to inquire about, Mr. O'Donnell?
 4            MR. O'DONNELL:  Your Honor, I think -- I'm just
 5   thinking in terms of the technical jurisdictional requirements.
 6            THE COURT:  Yes.  I understand you are concerned about
 7   venue.
 8            MR. O'DONNELL:  And I think that is sufficiently
 9   established, because wires came into New York City and the
10   defendant made that clear.
11   BY THE COURT:
12   Q.  In any event, I understand that you want to be tried or you
13   want to be prosecuted here in the Southern District of New
14   York, so if you have any right to complain about venue, you are
15   prepared to give that up?
16   A.  Yes, I understand that.
17   Q.  You are waiving any possible complaints about venue?
18   A.  Most of the funds, most of the funds, in fact, all of the
19   funds that were in the index arbitrage strategy specifically
20   were in Manhattan.
21   Q.  So you are satisfied in any event that your crime was
22   committed in the Southern District of New York?
23   A.  That's correct.
24            MR. O'DONNELL:  Yes.  Mr. Greenwood has made clear
25   that the means and instrumentality of interstate commerce were
```

```
 1    used to facilitate this scheme.  I believe that is true.
 2             THE COURT:  He was working from Connecticut.
 3             MR. O'DONNELL:  And they were sending wire transfers.
 4    BY THE COURT:
 5    Q.  And you were sending money back and forth between
 6    Connecticut and New York.
 7    A.  And New York, yes.
 8    Q.  New York City, that is Manhattan?
 9    A.  Yes.
10             MR. O'DONNELL:  With respect to money laundering, I
11    don't think there is any dispute that there were financial
12    transactions in excess of $10,000 involving the fraud proceeds.
13    BY THE COURT:
14    Q.  Is there any question about that?
15    A.  No.
16    Q.  You have given me millions as a number which clearly
17    exceeds $10,000.
18    A.  Yes.
19             MR. O'DONNELL:  I think that's all I had, your Honor.
20             I had a few other things in terms of the defendant's
21    rights that I may have --
22             THE COURT:  Yes.
23             MR. O'DONNELL:  I think it is pretty clear from the
24    record that Mr. Greenwood understands that he has a right to be
25    represented by counsel.
```

```
 1              THE COURT:  Well, he's got counsel.
 2              MR. O'DONNELL:  He has counsel.
 3              THE COURT:  It is only concerned if he doesn't have
 4     counsel that I will appoint him counselor, not if he doesn't
 5     need counsel.
 6              MR. O'DONNELL:  Exactly, your Honor.
 7              I also think it is pretty clear from the record that
 8     Mr. Greenwood understands that although he certainly does not
 9     have to testify at a trail and no inference to be drawn for not
10     testifying, he could, if he wanted, could testify.
11              THE COURT:  Are you concerned about that?
12              What I told him is he has no obligation to testify and
13     nobody can draw any inference from his silence.
14              MR. O'DONNELL:  But the other side of that --
15              THE COURT:  That is a constitutional right.
16              MR. O'DONNELL:  The other side of that, your Honor, is
17     he could testify if he wanted to.
18              THE COURT:  I'm sure that -- well, I'm interested to
19     see where you see that here.
20              MR. O'DONNELL:  Your Honor, it has just been my
21     practice to make sure that the defendant understands he has the
22     option either way.
23              THE COURT:  I understand.  I really don't mind
24     overkill.
25              MR. O'DONNELL:  Exactly.
```

```
1    BY THE COURT:
2    Q.  You understand if you wanted to go to trial and if you
3    wanted to testify, you certainly have the constitute right to
4    do so?
5    A.  I understand.
6            Very well.
7            After listening to you, Mr. Greenwood, I am satisfied
8    that you understand what the charges against you are and the
9    rights that you are giving up when you enter a plea of guilty
10   and that your mind is clear today, so I am going to now turn to
11   the indictment and ask you as to each count how you plead.
12           How do you plead to Count 1 of the indictment?
13   A.  Guilty.
14   Q.  Count 2?
15   A.  Guilty.
16   Q.  Count 3?
17   A.  Guilty.
18   Q.  Count 4?
19   A.  Guilty.
20   Q.  Count 5?
21   A.  Guilty.
22   Q.  Count 6?
23   A.  Guilty.
24   Q.  Very well.
25           And are you familiar with the forfeiture provisions in
```

```
 1    the indictment?
 2    A.  Yes, I am.
 3    Q.  And you agree to be bound by them?
 4    A.  Yes, I do.
 5    Q.  Very well.
 6            I am satisfied that you understand what you are doing
 7    and are doing it of your own free will and with careful advice
 8    from lawyers and I will enter your pleas of guilty, and I will
 9    request a presentence report from the Probation Department and
10    I will set a date for sentence.
11            I also grant the government's application -- well, I
12    guess its a point application -- that you be continued on bail
13    pending sentence.
14    A.  Thank you, your Honor.
15            MR. HAFETZ:  Thank you, your Honor.
16            THE COURT:  Very well.  You may be seated.
17            It is my experience that I will not get a presentence
18    report in less than 60 days and I will we lucky if I get it
19    within 60 days.
20            MR. O'DONNELL:  That's correct.  And in addition, your
21    Honor, we expect that Mr. Greenwood will testify at trial
22    against Mr. Walsh so we would request that the sentencing be
23    held after the trial is heard.
24            MR. HAFETZ:  We consent to that.
25            THE COURT:  Very well.
```

```
 1              Now we have not yet set sentence and I don't know --
 2      -- set a trial.  We will discuss tomorrow how far off that is.
 3              MR. O'DONNELL:  Actually, Friday, but I agree.
 4              THE COURT:  Thank you, yes.
 5              This week has run together for other reasons.  There
 6      are other matters, including an enforcement action, and I am
 7      beginning to think that it really is not efficient to separate
 8      enforcement actions in criminal cases and distribute them among
 9      two different judges, because I have now had three different
10      ones this year.  As you know, in this one I have tried to
11      collaborate with Judge Daniels because that is the only
12      efficient way to do it.
13              MR. O'DONNELL:  We agree, your Honor.
14              THE COURT:  And there is a lot to be said for a
15      relatedness concept in these cases where the enforcement action
16      and the criminal action are so clearly related and so
17      intertwined in many aspects.
18              So, again, I'm going to send a message through you to
19      the U.S. Attorney's office that I think that that should really
20      be re-examined whether there should be a relatedness concept.
21              MR. O'DONNELL:  Your Honor, I have always wondered why
22      they are not assigned to the same judge myself.
23              THE COURT:  Exactly, exactly.
24              MR. O'DONNELL:  I don't know if it is from our office
25      or the court.
```

```
 1          THE COURT:  I think it is in part that we do not have
 2    a relatedness concept on the criminal side of the court.  But
 3    here is an area that the relationship is so close and so
 4    intertwined where one case really affects the other that I
 5    think it would be very sensible.
 6          MR. O'DONNELL:  Your Honor, it may very well be a
 7    court rule as opposed to something from the government.
 8          THE COURT:  Well, yes and no.
 9          No, I understand that.  I suppose it is in a loose
10    way.  But I don't think that anybody has really considered the
11    relationship between these enforcement actions and the criminal
12    action and I think that if -- I am going to raise it with the
13    court, also, but I would like the U.S. Attorney's office to
14    recognize that this is a setting in which the normal rules that
15    we don't have a relatedness doctrine which really means among
16    criminal cases that come out of the same, loosely the same
17    course of conduct should not really preclude that in these
18    cases where efficiency really requires that there be
19    coordination.
20          MR. O'DONNELL:  I certainly understand the court's
21    observations and I will pass them along.
22          THE COURT:  Thank you.  And I am going to raise them
23    with my own colleagues as well.
24          If there is really a court rule, it's a vague long
25    buried rule that has no obvious reason in these particular
```

```
 1   cases.  I am going to pursue it and I would like you to pursue
 2   it as well.
 3               MR. O'DONNELL:  Very well, your Honor.
 4               THE COURT:  All right.
 5               Well, let me ask you, Mr. O'Donnell, what are the
 6   chances of getting the rest of this case to trial this year?
 7               MR. O'DONNELL:  Your Honor, I really can't answer that
 8   question without obviously having Mr. Walsh and his counsel
 9   here.
10               THE COURT:  Well, I understand, but it looks to me as
11   if their interest is in delaying it as much as possible.
12               MR. O'DONNELL:  Certainly I would like to have the
13   case tried before the end of the year if the court schedule --
14               THE COURT:  As am I, because I'm a great proponent of
15   speedy trials.
16               MR. O'DONNELL:  We plan to make that argument on
17   Friday that the court should set a trial date and basically
18   force us to work toward a trial date.
19               THE COURT:  Very well.  Then I will -- I don't like to
20   have any date dangle and I would like to get a presentence
21   report even if we don't go to trial immediately.  So I'm going
22   to set a date which may be postponed if the trial does not go
23   forward for sentence.
24               I don't really like to put it over so far, but I am
25   going to tentatively set it for December 1.
```

```
 1              MR. HAFETZ:  Your Honor, I'm just wondering, if I may,
 2  your Honor --
 3              THE COURT:  Yes.
 4              MR. HAFETZ:  -- whether in view of the fact that Mr.
 5  Greenwood has entered into a cooperation agreement to testify
 6  against Mr. Walsh at trial, I'm just wondering if it might make
 7  sense to do the PSR after the trial.
 8              THE COURT:  Well, I don't think that the U.S.
 9  Attorney's office depends on the PSR for its understanding
10  whether Mr. Greenwood is really cooperating.  I don't think the
11  Probation Department understands whether that's the case.
12  There is no way that they can.
13              MR. HAFETZ:  Okay, fine.
14              THE COURT:  They depend on the U.S. Attorney's office
15  about any report about cooperation rather than the other way.
16              MR. HAFETZ:  Okay.
17              THE COURT:  So I'm going to set a tentative date of
18  December 1 at 10:30 in the morning, which may well be moved.
19  But I hope that the trial may start before that.  We will see.
20              Is there anything further?
21              MR. HAFETZ:  Your Honor, if I may, I gather with
22  regard to the court conference on Friday, our appearance would
23  be excused from that in view of the --
24              THE COURT:  Yes, you are excused.
25              MR. HAFETZ:  And the other thing, your Honor, I would
```

37

```
 1   request that Mr. Greenwood be permitted to travel to North
 2   Carolina, South Pines, North Carolina, August 6 through the 12.
 3            THE COURT:  It is his daughter's school?
 4            MR. HAFETZ:  It's not the school, it's the same area
 5   where his wife has a residence and they have friends and they
 6   visited in the past.  My understanding the government does not
 7   oppose the application, your Honor.
 8            MR. O'DONNELL:  We don't, your Honor.
 9            THE COURT:  And when is this?
10            MR. HAFETZ:  The dates are August 6 to August 12, your
11   Honor.  The place is Southern Pines, North Carolina.
12            THE COURT:  Very well.  I will permit that.
13            MR. HAFETZ:  Thank you, your Honor.
14            THE COURT:  You have deposited your passport with the
15   court, I take it?
16            THE DEFENDANT:  Yes.
17            THE COURT:  Very well.
18            All right.  Is there anything further?
19            MR. O'DONNELL:  No, your Honor.  Thank you for making
20   yourself available on such short notice.
21            THE COURT:  Very well.  Then you are all excused.
22                          - - -
23
24
25
```