**EXHIBIT E**

# AGREEMENT FOR INVESTMENT MANAGEMENT SERVICES - WESTRIDGE CAPITAL MANAGEMENT, INC.

THIS AGREEMENT is made and entered into on this 30th day of April, 1998 by and between VIACOM INC. ("Client") and Westridge Capital Management, Inc., a corporation organized and regulated under the laws of the State of Delaware ("Manager");

## WITNESSETH:

WHEREAS:

(a) Client is authorized to make an investment as it deems prudent; and

(b) Client is further authorized to delegate its investment power to third parties, and wishes to appoint the Manager as its investment manager with respect to a designated portion of its funds allocated for investment in enhanced index funds; and

(c) Manager operates an enhanced index fund and is willing and able to manage Client funds allocated for investment; and

(d) Both Client and Manager intend that this Agreement be interpreted and implemented in a manner consistent with the fiduciary standards set forth therein;

NOW, THEREFORE, it is agreed as follows:

(1) <u>Definitions.</u> The following words and phrases shall have the following meanings unless a different meaning is clearly required by the context:

1.1 "<u>Account</u>" means the assets of Client which will include in the Account all income, proceeds and profits thereon.

(2) <u>Retention of Manager and Duties of Manager.</u> Client hereby appoints Manager as an Investment Manager. Client hereby delegates to the Manager complete authority and full discretion to invest and reinvest the assets of the Account subject to the terms and conditions of this Agreement. By its execution of this Agreement, Manager accepts the foregoing delegation of investment management responsibility and agrees to manage the Account and carry out its duties and obligations under this Agreement. The Manager shall not be responsible for the overall diversification of the investment of assets of Client. The only responsibility of Manager with respect to investment diversification shall be to diversify the investments of the Account subject to the investment policy and guidelines described in section 3 of this Agreement.

1

Manager shall not act as custodian for funds or assets of the Account, or take or have possession of any funds or assets of the Account. Manager shall have such authority to direct the deposits and disbursement of funds and assets in or from the Account as may be consistent herewith and as Client may specify in written directions. Manager shall have full power and authority on behalf of the Account to establish and deal through accounts with one or more securities brokerage firms, dealers, banks or futures commissions merchants as Manager may select (collectively, "brokers"). In selecting a broker, manager shall consider a number of factors, including, without limitation, the overall direct net economic result to the Account (including commissions, which may not be the lowest available but which ordinarily will not be higher than the generally prevailing competitive range), the financial strength and stability of the broker, the efficiency with which the transaction is effected, the ability to effect the transaction at all where a large block or other complicating factors are involved, the availability of the broker to stand ready to execute possible difficult transactions in the future and other matters involved in the receipt of brokerage and research services as contemplated by Section 28(e) of the Securities Exchange Act of 1934, as amended, and the regulations and interpretations of the Securities and Exchange Commission promulgated thereunder, without having to demonstrate that any such factor is of a direct benefit to the Account. Client acknowledged that Manager may aggregate investments of the Account with the assets of the other clients of manager in effecting transactions therein and that the Account shall bear its proportionate share of discounts or commissions payable with respect to such transactions.

Subject to the provisions of the preceding paragraph, the Client hereby consents to the employment by Manager of WG Trading Company, an affiliate of Manager, to effect transactions for the Account. The Client hereby acknowledges that such transactions may include agency cross transactions and that WG Trading Company may act as broker for, receive commissions from, and have potentially conflicting divisions of responsibilities and loyalties regarding both parties to such transactions, provided, however, that no such transaction shall be effected in which Manager and WG Trading Company, or either of them, recommended the transaction to both parties. The foregoing consent may be revoked at any time by written notice from Client.

(3) <u>Investment Policy and Manager's Authority</u>. A statement of investment policies and portfolio restrictions setting forth the investment objectives for the Account and guidelines for the implementation thereof is set forth in Exhibit A attached hereto and incorporated herein by reference. Subject to fiduciary standards the provisions of this Agreement, the Manager shall comply with the provisions of Exhibit A. Subject to the provisions of Exhibit A and the further provisions of this Agreement, the Manager, acting as Client's agent and attorney-in-fact, shall have discretionary investment authority, to issue brokers instructions to sell and otherwise trade in or deal with any asset in the Account; to sell to any person any assets in the Account; to instruct any trustee or custodian of any asset of the Account to deliver securities or other assets sold, exchanged, or otherwise disposed of from the Account and generally to perform any other act necessary or proper to enable Manager to carry out its obligations under this Agreement.

(4) <u>Ongoing Evaluation of Investment Policy</u>. The Manager shall evaluate on a continuous basis, and at such other times as Client may reasonably direct, the assets of the Account with respect to the investment policy of the Account and the standards of fiduciary responsibility. In this regard, the Manager shall make such recommendations to Client for changes in the investment policy of the Account as the Manager may deem appropriate from time to time.

(5) <u>Manager's Compensation</u>. As and for compensation for all of Manager's rendered services hereunder, Client shall pay to Manager a fee at the times and in the amounts computed in accordance with Exhibit B attached hereto and incorporated herein by reference.

(6) <u>Manager's Reporting Duties</u>. Manager shall notify Client of all purchases, sales and exchanges of investments on a monthly basis. Such notifications shall be in writing and shall include, but not be limited to, the following information:

(a) For purchases, the trade date, description of securities, number of shares or other units involved, price per share or unit, total cost of purchase, and

(b) For sales or exchanges: trade date, description of securities, number of shares or other units involved, and total proceeds of the sale or exchange.

On a monthly basis, Manager shall provide a report containing an Account analysis based upon the current market value of the Account. The Account analysis shall include a listing of transactions and a comparison of the Account as measured against the Standard & Poor's 500 Total Return Index.

(7) <u>Documents and Authorities</u>. Client represents and warrants that the appointment of Manager on the basis set forth in this Agreement is authorized by and has been accomplished in accordance with Client's by-laws.

Client acknowledges that (i) the incentive compensation formula of Manager contained in Exhibit B may create an incentive for Manager to make investments that are riskier or more speculative than would be the case in the absence thereof and provides for compensation to be paid on the unrealized appreciation, as well as the realized gains, of the Account; (ii) the index against which the performance of the Account is measured in determining the incentive compensation is the Standard & Poor's 500 Total Return Index, which is a broad-based index of equity securities and which is expected to provide the primary basis of many of the investments in the Account; (iii) to the extent the incentive fee is based on the unrealized appreciation of investments for which market quotations are not readily available, the value of such investments will be determined in accordance with Exhibit B; and (iv) the incentive compensation will be paid annually and at the end of the term hereof and will not be refunded if the value of the Account decreases after the period with respect to which the incentive compensation is paid.

3

(8) <u>Indemnifications</u>. The Manager shall indemnify Client, its partners, agents and employees from any and all claims, demands, damages, costs of expenses, including attorney fees, that are reasonably incurred by Client and that are attributable to a breach by the Manager of its fiduciary duties under this Agreement.

(9) <u>Non-Exclusive Contract</u>. Manager acknowledges that it is engaged hereby as a non-exclusive investment advisor to Client with respect to funds deposited in the Account only.

Client acknowledges that Manager renders, and may continue to render, investment advisory services for present and future clients and customers other than the account.

Nothing in this Agreement shall be deemed to impose upon Manager any obligation to purchase or sell or to recommend for purchase or sale by or for the Account any security or other property which the principals or employees of Manager may purchase or sell for their own accounts or which Manager may purchase or sell for the account of any other client or customer. Client agrees that Manager may give advice and take action with respect to any of its other clients which may differ from advice given with respect to the Account, or the timing or nature of action taken with respect to the account, so long as it continues to be the policy and practice of Manager not to favor or disfavor consciously any client or class of clients in the allocation of investment opportunities so that, to the extent practicable, such opportunities will be allocated among clients over time on a fair and equitable basis. Client recognizes that transactions in a specific security may not be accomplished for all client accounts at the same time or at the same price. Neither Manager's acceptance of the investment objectives nor any other provision of this Agreement shall be considered a guaranty that any specific result will be achieved.

(10) <u>Limitation of Rights, Powers, and Duties</u>. Manager's rights, powers and duties shall be limited to those specifically listed herein with respect to Fund assets included in the Account, and Manager shall have no duty, responsibility or liability in connection with the custody, investment, or management of other Fund assets and shall have no duty, responsibility, or liability in connection with the operation or administration of the Fund.

(11) <u>Term and Termination</u>. This Agreement shall continue until modified or terminated. It may be modified at any time upon mutual agreement of Manager and Client. It may be terminated at any time by either Manager or Client upon thirty (30) days written notice to the other. Neither notice of termination nor the actual termination shall relieve the Manager of its obligations to complete all transactions commenced prior to the termination date and to deliver to Client all books, records or other material maintained by the Manager for the benefit of the Account. Except as otherwise provided herein, upon receipt of termination notice, Manager shall have no further investment management responsibility for assets in the Account, subject only to such trading or sales of investments as Manager deems necessary for the benefit of the Account and are approved by Client or as otherwise specifically directed by Client.

(12) <u>Assignment</u>. This Agreement may not be assigned or transferred by either party without the written consent of the other party. Neither a merger, consolidation, or sale of the Manager shall effect a transfer of this Agreement to any successor without the specific written consent of Client.

(13) <u>Investment Advisers Act of 1940</u>. The Manager represents and warrants that it is registered as an investment adviser under the Investment Advisers Act of 1940, as amended. The Manager shall notify Client immediately of any termination or revocation of such registration or of the commencement of any proceedings which may result in such termination or revocation. The Manager further represents and warrants that it has fully complied with the requirements of and has performed all acts mandated by the United States and the State of California in order to permit the Manager to act as the investment manager for the Account under the terms and conditions of this Agreement.

(14) <u>Notices</u>. All notices, reports, billings, or other written communications, either required or permitted under the terms of this Agreement, shall be deemed made when deposited, postage prepaid, in the United States Postal Service Mail addressed as follows:

> Westridge Capital Management, Inc.
> 222 East Carrillo
> Suite 300
> Santa Barbara, CA  93101

(15) <u>Severability</u>. If any provisions of this Agreement are held invalid or unenforceable, such invalidity or unenforceability shall not affect any other provision, and the Agreement shall be construed and enforced as if such provisions had not been included.

(16) <u>Controlling Law</u>. This Agreement shall be construed in accordance with applicable federal law and, to the extent not preempted, the laws of the State of California.

By: _____
Viacom Inc.

By: _____
Westridge Capital Management, Inc.

## Enhanced Core Equity Index Guidelines

Investment Manager:   Westridge/WG Trading

Westridge/WG Trading has been designated as an enhanced equity manager. Westridge/WG Trading is expected to invest in S&P 500 futures contracts to achieve exposure to the equity markets and actively manage remaining funds in an arbitrage trading strategy to add value. The portfolio will be measured against the S&P 500 over both short and long-term periods.

<u>Westridge</u> (Establishes equity exposure and actively manages the assets held for margin calls in short-term instruments - Refer to attached chart on the following page).

Westridge will have discretion over 20% of the total investment. The purpose of the assets managed by Westridge are 1) to establish the S&P 500 Index futures position which equitizes the investment and 2) to provide an actively managed, short-term reserve account to be used for any margin calls. Approximately 4% of the total investment will be utilized in the margin account to establish the futures positions. The assets utilized for the margin account are held at Morgan Stanley in the form of Treasury bills. The remaining 16%, which Westridge has discretion over, will be invested in liquid securities and will be utilized for margin calls if necessary. These funds will be held at Mellon Trust and will be wired to Morgan Stanley if a margin call is necessary per direction from Westridge (both Westridge and Morgan Stanley mark-to-market daily for the futures positions).

The following outlines the investment guidelines for Westridge:

1. May invest in S&P 500 Index financial futures. The dollar amount of the S&P 500 Index exposure, achieved through the use of futures, will be equal to the total dollar amount invested in the WG Trading L.P. and the Westridge account at all times.

2. Cash instruments shall not exceed nine months average maturity. No instrument will have a stated final maturity of over two years.

3. All securities will have an investment rating of at least BBB by a nationally recognized standard rating organization. A maximum of 5% of the portfolio will be invested in BBB-rated securities. The average rating of the portfolio will be A or better.

4. Commercial paper must have a rating of at least A1/P1.

5. No individual holding will comprise more than 10% of the portfolio with the exception of U.S. Treasury securities.

6. No single fixed income sector will comprise more than 25% of the portfolio with the exception of U.S. Treasury securities.

7. Foreign securities will not comprise more than 10% of the portfolio. Euro dollar securities may comprise no more than 25% of the portfolio.

8. No currency risk is expected or permissible.

**Prepared by Marquette Associates, Inc.   4**

9. Leveraging of the Westridge portfolio is prohibited. (See WG Trading guidelines below).

10. The following types of investments are explicitly prohibited:

    Interest-Only and Principal-Only mortgages
    Interest rate swaps
    Inverse floaters
    Structure notes - Except as an investment in WG Trading L.P.

11. Outright short selling of individual stocks, futures, or options is prohibited.

12. The manager will vote all proxies in the best long-term interest of the Viacom Pension Plan.

13. The purchase of any Viacom equity, debt, or other securities is prohibited.

WG Trading L.P. (Cash Enhanced Management)

WG Trading L.P. will have discretion over 80% of the total investment. Since Viacom has elected not to directly participate in the limited partnership, Viacom has exchanged cash for a promissory note from WG Trading. Since the cash provided to WG Trading will be invested in the limited partnership, the return on the promissory note held by Viacom will be identical to the return of the WG Trading L.P.

WG Trading conducts index arbitrage trading to take advantage of mispriced futures contracts. This represents the cash enhanced portion of the investment and is managed with the goal of outperforming the return of LIBOR. As discussed above, the S&P 500 futures will be managed by Westridge. This portion of the investment will provide a total return approximately equal to the performance of the S&P 500 Index less the return of LIBOR.[2] Consequently, if the enhanced cash portfolio outperforms the return of LIBOR, the investment in totality will outperform the return of the S&P 500 Index.

The assets managed by WG Trading are custodied at Merrill Lynch, the clearing broker. The WG Trading L.P. is unitized. The number of units held by Viacom and the unit price will be reported to Mellon by WG Trading.

The following outlines the investment guidelines for WG Trading:

1. At least 80% of the WG Trading portion of the investment will be invested in stock index arbitrage of the S&P 500 Index or the S&P 400 Index. The funds which are not invested in stock index arbitrage will earn overnight interest rates.

2. Not more than 20% of the WG Trading portion of the investment will be invested in U.S. convertible bond hedging, preferred stock hedging, and warrant hedging (i.e. convertible

---

[2] S&P 500 Index futures contracts are priced at a premium to the spot rate of the S&P 500 Index. The generally accepted risk-free rate of return (LIBOR) is used to calculate the premium at which futures contracts should be priced relative to the S&P 500 spot rate. Consequently, an investment fully equitized using S&P 500 futures contracts will earn a return equal to the S&P 500 less the return of LIBOR (due to the premium built into the price of the futures contract).

**Prepared by Marquette Associates, Inc. 5**

hedging). In the hedged positions, WG will buy convertible bonds, preferred stocks, or warrants and simultaneously sell short the underlying common stock. This is a market neutral position which sets up a positive cash flow in the broker-dealer environment of WG. This positive cash flow serves to reduce the volatility of the overall portfolio return (See definitions).

3. No individual holding will comprise more than 10% of the convertible bond, preferred stock, and warrant hedging portfolio.

## Index and Enhanced Equity Definitions

### Core Domestic Equity

**S&P 500 Index** - A market-value weighted index comprising 500 widely held common stocks, including industrial, utility, financial, and transportation stocks primarily but not exclusively traded on the New York Stock Exchange. It represents about 77% of the New York Stock Exchange market capitalization. This is a total return index with dividends reinvested, as calculated by Wilshire Associates.

**Russell 3000 Index** - Composed of 3,000 large US companies by market capitalization, representing approximately 98% of the US equity market. The smallest company in the Russell 3000 has a market value of roughly $25 million. The largest has a market value of about $70 billion. The index is reconstituted annually since 1989.

**Wilshire 5000 Index** - A market-value weighted index of all US common equity securities with readily available price data. Over 5,000 market value-weighted security returns are used to adjust the index. The capital value of the index is composed of approximately 86% of New York Stock Exchange issues; 3% of American Stock Exchange stock issues; and 11% of NASDAQ over the counter issues. It is a total return index with dividends reinvested.

### Enhanced Index - Domestic Equity

**Convertible Hedging** - A convertible security is a bond, preferred stock, or warrant that is convertible under prescribed circumstances into the common stock of a corporation. As a result, the prices of convertible securities and the corresponding common stock move closely in tandem. A hedged convertible position purchases the convertible security and sells short the underlying common stock. This trade establishes a position which is theoretically insensitive to the movement of the markets because the volatility of the convertible bond is hedged away by the short common stock. (As the price of the convertible bond rises, the value of the short position falls. As the price of the convertible bond falls, the value of the short position rises). If the investment manager is a broker/dealer (WG), then:
- the short-sale of a common stock generates cash which is available for immediate reinvestment;
- the cash generated from the short sale of the common stock is used to purchase the convertible security;
- therefore, the broker/dealer does not incur the cost of carrying the long position, and simply earns the coupon or dividend return on the hedged convertible bond or hedged convertible preferred stock without investing any capital. This trade establishes positive cash flow at the broker/dealer level.

If the investment manager is not a broker/dealer (SSI), then:
- the cash generated from the short-sale of a common stock is held at the broker/dealer level and is not available for immediate reinvestment;
- the investment manager must utilize capital to purchase the long convertible security;

- the common stock which is borrowed for the short-sale is collateralized at the broker/dealer level;
- the collateral for the borrowed common stock earns a nominal interest rate which is split between the security lender, the broker/dealer, and the short-seller[3];
- the goal of a hedged convertible bond or a hedged convertible preferred stock position in a non-broker/dealer environment is to earn the coupon or dividend return on the convertible security coupled with the interest income on the short position. A hedged warrant position will only generate cash from the interest income on the short position.

**Convertible Bond** - A convertible bond is a fixed income security issued by a corporation and is exchangeable for a given number of common shares at a prestated price.

**Convertible Preferred Stock** - A preferred stock pays dividends at a specified rate and has preference over common stock in the payment of dividends and the liquidation of assets. The security is also exchangeable for a given number of common shares at a prestated price.

**LIBOR** - The London Interbank Offered Rates (LIBOR) are the rates that large banks charge one another for large loans of Eurodollars in the London market. This rate has become the premier short-term interest rate, and it serves as a reference rate for a wide range of transactions.

**Stock Index Arbitrage** - Stock index arbitrage is an investment strategy which involves the simultaneous purchase or sale of all the securities (in their correct weightings) in an index (e.g., S&P 500 or S&P 400) and an offsetting sale or purchase of the corresponding index futures.

For example, a firm will buy all of the 500 stocks within the S&P 500 via a computer assisted trading program, and simultaneously sell the S&P futures contract. Accordingly, the market position is zero. This transaction upon execution locks in a profit from the difference between stock price and the futures' price. In addition, the firm will receive the dividends paid on the stocks they own and pay an interest cost to carry the position. With more volatile markets the basis between the stocks and the futures may change and have the opportunity to trade out of the positions before the expiration of the futures and realize additional profits.

**S&P 400 Index** - Consists of 400 domestic stocks chosen for market size, liquidity, and industry group representation. It is a market-value weighted index with each stock affecting the Index in proportion to its market value. This index, calculated by Standard & Poor's, is a total return index with dividends reinvested.

**S&P 500 Index Futures Contracts** - A contract to buy or sell the S&P 500 Index at a particular price. The price is established between buyer and seller on the floor of the IOM (index and options market), using the open outcry system. A futures contract obligates the buyer to purchase the underlying commodity and the seller to sell it, unless the contract is sold to another before settlement date. The value of the S&P 500 Index is 500 times the price of the futures contract. The S&P 500 Index futures contracts are priced at a premium to the spot rate of the S&P 500 Index. The generally accepted risk-free rate of return (LIBOR) is used to calculate the premium at which futures contracts

---

[3] The non-broker/dealer incurs the cost of carrying the long position while earning interest on the short position. Since the cost of carrying the long position will always exceed the interest earned on the short position, the broker/dealer will have an absolute advantage when executing a hedged convertible trade.

should be priced relative to the S&P 500 spot rate. As of April 21, 1998, the margin requirement to control one S&P 500 Index futures contract was $14,000.

**Warrant** - A warrant is a security that entitles the holder to buy a proportionate amount of a common stock at a specified price, usually higher than the market price at the time of issuance.

## *Value Equity*

**Russell 1000 Value Index** - The Russell 1000 Value Index is a total return index that comprises stocks from the Russell 1000 Index with a less than average growth orientation. It represents the universe of stocks from which value managers typically select. The index is reconstituted annually since 1989.

## *Growth Equity*

**Russell 1000 Growth Index** - The Russell 1000 Growth Index contains stocks from the Russell 1000 Index with a greater than average growth orientation. It represents the universe of stocks from which earnings growth managers typically select. The index is reconstituted annually since 1989.

## *Small-Mid Capitalization Equity*

**Russell 2000 Index** - consists of the 2,000 smallest securities in the Russell 3000 Index. Representing approximately 12% of the Russell 3000 total market capitalization, this is a widely regarded small-cap index. The average market capitalization is $421 million. The largest company in the Index has an approximate market capitalization of $1,018 million.

**Wilshire 4500 Index** - The Wilshire 4500 Equity Index is a market value-weighted index of all US common equity securities with readily available price data (excluding the S&P 500 securities which together with the 4500 comprise the Wilshire 5000). It is a total return index with dividends reinvested.

## *International Equity*

**MSCI EAFE Index (Gross Dividends)** - Morgan Stanley Capital International's EAFE Index includes over 1,070 companies representing several international stock markets in Europe, Australia and the Far East. The Europe component includes over 600 stocks in 14 markets. The Pacific component includes over 460 stocks in 6 markets, including Australia and New Zealand. Gross EAFE is calculated with dividends reinvested and is expressed in U.S. dollars.

## *Fixed Income*

**Lehman Brothers Aggregate Index** - includes fixed-rate debt issues rated investment-grade or higher by Moody's, S&P, or Fitch, in that order. All issues have at least one year to maturity and an outstanding par value of at least $100 million for US Government issues and $50 million for all others. All returns are market value weighted and inclusive of accrued interest. The Aggregate Bond Index is a composite of the Government/Corporate Index and the Mortgage-Backed Securities Index. Total return includes price appreciation/depreciation and income as a percentage of the original investment. The total return index is rebalanced monthly by market capitalization.

## Exhibit B
## Fee Schedule

I. <u>Base Fee</u> - Manager shall be paid a Base Fee quarterly in arrears after Viacom Inc.'s and Manager's receipt and approval of reports from Viacom Inc.'s Custodian regarding the account's value. The quarterly Base Fee shall be equal to .0625% (.25% annually) of the average of the month-end values of the Account during the computation period.

II. <u>Performance Fee</u> - In addition to the Base Fee, Manager shall be paid a performance Fee annually in arrears after Viacom Inc.'s and Manager's receipt and approval of reports from Viacom Inc.'s Investment Consultant regarding the account's value and performance. The Performance Fee shall be computed as follows:

> 25% of annual performance in excess of the sum of the total return of the S&P 500 plus .25%. Underperformance (total return of the account less than the total return of the S&P 500 plus .25%) in any annual period(s) must be recouped before any Performance Fee is due.

III. <u>Valuation</u> - The Investments contained in the Account shall be valued for purposes of the calculation of the Base Fee and the Performance Fee (I) for all common equities and debt securities, at market close values, as reported by Custodian and Investment Consultant, (ii) for all futures which are not equity-based, at settlement price on the exchange on which the futures contracts are traded as of the later of the close of such exchange or the close of market on the underlying securities or index, (iii) for all equity-based futures, at the sum of (x) the value of the investment to which the futures contract relates (determined in accordance with this Exhibit) plus (y) the product obtained by multiplying the value of the investment to which the futures contract relates (determined in accordance with this Exhibit), times the amount, if any, by which the LIBOR rate for the period ending on the expiration of the futures contract exceeds the dividend yield on the investment to which the futures contract relates (as such rate and yield are calculated and reported by Goldman, Sachs & Co. or by any other broker-dealer acceptable to Viacom Inc. and Manager) through the expiration date of the futures contract, (iv) for exchange-traded options, at the last sale price and, if no sales took place on the date of valuation, then at the mean between the bid and ask prices as of such date, (v) for all call options not described in the preceding clause, (iv) at the excess of the market value of the underlying investment over the striking price of the option, and (vi) for all put options not described in the preceding clause (iv) at the excess of the striking price of the option over the market value of the underlying investment.